**Gary Christopher MORROW, Appellant**

v.

**The STATE of Texas, Appellee**

**No. 06–15–00013–CR**

Court of Appeals of Texas, Texarkana.

Submitted: January 11, 2016

Decided: February 19, 2016

---

Micah Belden, Micah Belden, PC, Sherman, TX, for appellant.

John B. Setterberg, Assistant District Attorney, Bonham, TX, for appellee.

Before Morriss, C.J., Moseley and Burgess, JJ.

## OPINION

Opinion by Justice Moseley

In the midst of a turbulent divorce, a camouflage-clad Gary Christopher Morrow broke a garage window to gain entrance into the rural Ivanhoe home occupied by his wife, Gina Morrow, during the early morning hours of May 5, 2013. As he entered the home's master bedroom where Gina was asleep with her boyfriend, Donny Mangum, Morrow wielded a hunting knife and a forty-caliber handgun. Enraged, Morrow began shouting at Gina and threatened to kill both Gina and Mangum. Eventually, Morrow undertook to take Mangum, Gina, and Marissa (Gina's adult daughter) outside the house, at which point Mangum was able to flee. Mangum's escape angered Morrow even further, and he threatened Gina and Marissa with death. Morrow then ordered Gina into her truck in the nearby driveway, where he joined her. Once inside the truck, Gina was forced under a continued threat of death to perform oral sex on Morrow.

When Morrow saw flashing police lights coming toward the house, he fled into the night. Police were able to track Morrow to Howe, Texas (in neighboring Grayson County), where he had fled to the apartment of a former girlfriend. Following a lengthy and intense standoff, Morrow surrendered to police and was taken into custody.

As a result of these events, Morrow was indicted for seven felonies. These constituted three counts of aggravated assault with a deadly weapon, one count of burglary of a habitation, one count of aggravated kidnapping, and two counts of aggravated sexual assault. The seven cases were consolidated and tried together to a jury. The only one of those charges of which Morrow was acquitted was one of the charges of aggravated sexual assault. Morrow was sentenced to prison terms of thirty years in one case, forty years in a second case, and twenty years each in four cases (all of which were to run concurrently) with fines totaling $60,000.00 in the six

cases. Morrow has appealed all of the convictions.[1]

In this case, Morrow appeals his conviction of burglary of a habitation,[2] for which he received a sentence of twenty years' imprisonment and a fine of $10,000.00. He contends that (1) counsel was ineffective for failing to investigate facts that he maintains (a) could have been employed in an attempt to mitigate punishment, and (b) could have led to a potential insanity defense; (2) the trial court erred in failing to conduct an informal competency evaluation on counsel's request; (3) the trial court erred in the admission of hearsay evidence during the guilt/innocence phase of the trial; (4) the trial court erred in the admission of hearsay evidence of bad acts during the punishment phase of the trial, and (5) the evidence is legally insufficient to convict Morrow of burglary of a habitation.

Because we find that (1) Morrow did not receive ineffective assistance of counsel, (2) the trial court properly exercised its discretion in having declined to conduct an informal competency evaluation, (3) there was no admission of improper hearsay evidence, and (4) the evidence is legally sufficient to support Morrow's burglary conviction, we affirm the judgment of the trial court.

Following his conviction, Morrow filed a motion for new trial. After a full evidentiary hearing on Morrow's motion for new trial, the trial court denied the motion. On appeal, Morrow claims that the evidence presented at the hearing proved that trial counsel was ineffective in failing to investigate facts that could have been used in mitigation of punishment and that could have led to a potential insanity defense.

**Standard of Review for Ineffective Assistance of Counsel**

The Sixth Amendment to the United States Constitution grants an accused the right to have the assistance of counsel for his defense, a right that has been interpreted to require the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The right to effective assistance of counsel does not mean, however, that counsel must be errorless or perfect. *Robertson v. State*, 187 S.W.3d 475, 483 (Tex.Crim.App.2006). A conviction resulting from ineffective assistance of counsel is constitutionally infirm. *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052.

Ineffective assistance of counsel claims are evaluated under the two-part test formulated in *Strickland*, requiring a showing of both deficient performance and prejudice. *Id.* at 689, 104 S.Ct. 2052; *Thompson v. State*, 9 S.W.3d 808, 812 (Tex.Crim.App.1999); *Fox v. State*, 175 S.W.3d 475, 485 (Tex.App.–Texarkana 2005, pet. ref'd). Ineffective assistance of counsel claims must be firmly rooted in the record, with the record itself affirmatively demonstrating the alleged ineffectiveness. *Lopez v. State*, 343 S.W.3d 137, 142–43 (Tex.Crim.App.2011). Failure to satisfy either prong of the *Strickland* test is fatal. *Ex parte Martinez*, 195 S.W.3d 713, 730 n. 14 (Tex.Crim.App.2006). Thus, we need not examine both *Strickland* prongs if one cannot be met. *Strickland*, 466 U.S. at 697, 104 S.Ct. 2052.

---

**1.** We address Morrow's related appeals from his convictions of (1) aggravated sexual assault in our cause number 06–15–00012–CR; (2) aggravated assault with a deadly weapon in our cause number 06–15–00014–CR; (3) aggravated assault with a deadly weapon in our cause number 06–15–00015–CR; (4) aggravated assault with a deadly weapon in our cause number 06–15–00016–CR; and (5) aggravated kidnapping in our cause number 06–15–00017–CR.

**2.** *See* Tex. Penal Code Ann. § 30.02(d) (West 2011).

To prevail on his ineffective assistance claims, Morrow must prove by a preponderance of the evidence that (1) his counsel's representation fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defense. *Id.* at 688, 104 S.Ct. 2052; *Tong v. State*, 25 S.W.3d 707, 712 (Tex.Crim.App. 2000). We indulge a strong presumption that counsel's conduct falls within the wide range of reasonable, professional assistance and was motivated by sound trial strategy. *See Jackson v. State*, 877 S.W.2d 768, 771 (Tex.Crim.App.1994).

**Evidence Presented During Hearing for Motion for New Trial.**

Joey Fritts was Morrow's trial counsel. At Morrow's hearing on his motion for a new trial, Fritts testified that before trial, Morrow and his mother, Shelia Morrow, had advised him that Morrow had once overdosed with drugs and alcohol, and on a different occasion, had threatened to commit suicide, this threat being the basis for his commitment to a mental institution. Fritts was also informed that Morrow had been hospitalized at Dallas' Parkland Hospital because he had been experiencing mental health problems. Fritts (who explained that he had been licensed as a registered nurse for thirty years) "got the feeling" based on his medical training that these incidents were related to Morrow's depression.

Fritts' notes of a meeting with Shelia indicate that Morrow was also hospitalized at Green Oaks Mental Hospital during December 2012 for two days and that Morrow had suffered severe bouts of depression on five or six different occasions. Fritts was aware that "people thought" Morrow had some "mental history." Fritts also received a letter from Shelia dated January 24, 2013, in which she stated that when Morrow went to Gina's house on May 4, 2013, "[d]ue to weeks of sleep deprivation and depression he [was] not thinking straight." She continued, "I have all of his text and his kids as witnesses as what it is doing to him. Including suicidal thoughts." Additionally, Fritts knew Morrow was suicidal on the night of his arrest. The arrest report from the Howe Police Department (where Morrow was tracked after the incident giving rise to the charges at trial), admittedly reviewed by Fritts prior to trial, stated Morrow told the contacting officer that "he had no intentions of exiting the apartment alive" and that it had been his intention to "end it" by killing himself. The offense report of the Fannin County Sheriff's Department (also reviewed by Fritts) indicated that Morrow made "suicidal threats throughout the incident" and made similar threats to Gina on the telephone immediately after the incident. Fritts testified that the mere statement that Morrow wanted to commit suicide did not mean he was mentally ill.

Fritts indicated that he never spoke to the trial court about having an expert appointed to review Morrow for a possible insanity or temporary insanity defense because there was no evidence in the record other than his threat to commit suicide that would show that he suffered from a mental illness. Further, Morrow had told law enforcement officers he had made the threats of suicide solely as a test to determine if his wife still cared about him. Fritts said that he never had any reason to think Morrow was insane that and he had no reason to believe Morrow was incompetent to stand trial.

As to the competency issues, Fritts explained that Morrow demonstrated that he knew what Fritts' responsibility was as his attorney, that he knew who the trial court and the prosecutor were, that Morrow filed some of his own motions, and that he understood how the court operated.

Fritts believed that Morrow undoubtedly understood the trial process, understood the nature of the charges against him and the ranges of punishment associated with those charges, and had a fair grasp of the facts of the case. Morrow also participated with Fritts in the presentation and preparation of his defense.

Even so, at one point during the trial, Fritts raised the issue of Morrow's competency with the trial court. At the hearing on Morrow's motion for new trial, Fritts testified that he probably should not have raised that issue because he believed Morrow was competent.

After having reviewed the Parkland Hospital records and the Medical Center of McKinney records subpoenaed for the hearing, Fritts acknowledged that Morrow was involuntarily committed in 2012. Fritts was aware of the fact that he could have obtained these records pursuant to a Health Insurance Portability and Accountability Act (HIPAA) release, so that the State would not have had access to them. Fritts did not do this, and he did not ask for the appointment of a consulting mitigation expert regarding mental health. Fritts neither requested nor obtained these records prior to trial.

Fritts added that he feared the records might include evidence of attempted suicide, a drug overdose, or excessive use of alcohol. He did not want this evidence to be admitted in either phase of the trial. He also understood that the records from the Green Oaks facility would reveal evidence of an attempted suicide. Fritts explained that he believed that such evidence could be a two-edged sword because while on the surface it might first appear to somewhat mitigate Morrow's responsibility, many people might also believe that "suicide or the attempt thereof is actually a damnable sin." Fritts stated that he did not want this evidence to come before the jurors, some of whom might have held this type of belief.

In further explanation, Fritts stated that evidence of past suicide threats or attempts could also be viewed in a bad light, revealing that Morrow abused alcohol and drugs. After he reviewed the records, it appeared to Fritts that is what they reflected. Fritts "didn't want that damning evidence into the trial." The suicide threat came into evidence during the guilt/innocence trial, and Fritts explained that he did not want to emphasize it. He testified that although many times people make such threats, they do not really intend to carry them out.

With respect to mitigation, Fritts testified that he believed the testimony of a psychologist regarding a mental illness would have been more damaging than helpful. He stated that this type of testimony could have opened the door for the State to admit Morrow's statement (which was suppressed during the guilt/innocence trial) to the effect that his motive in making the suicide threat was to judge his wife's level of care for him. Having successfully been able to suppress that statement, Fritts believed that evidence of past suicide attempts could be looked on with skepticism. Additionally, Fritts believed that some jurors might reject the argument that Morrow would be deserving of some mercy because he drinks, he takes drugs, and he threatens to kill himself because they could well have viewed such conduct as immoral. Fritts felt as if this type of information could have been more detrimental than helpful to Morrow in the punishment phase.

Shelia testified at the new trial hearing that she advised Fritts that Morrow suffered from headaches, depression, and sleep deprivation. She stated that she told Fritts that Morrow had been treated for depression, that he had tried to commit

suicide at least three times (beginning in 1995 or 1996), and that he had a scar on his arm as a result of a previous failed suicide attempt. At that time, Morrow had "literally slit his arm all the way down," and he was taken to the Medical Center of McKinney. At one point in 2011, Shelia tried to have Morrow committed, but was unable to do so because he was married and Gina refused to have him committed. Morrow cried most of the time, and he did not eat. Most recently, in April 2013, Morrow went three weeks without sleep and was, as Shelia described, "a bundle of nerves." She testified that Morrow has experienced depression, headaches, sleeplessness, and loss of appetite from at least 1996 through the present day.

Numerous medical records were included in the new trial record as exhibits. The earliest record from the Dallas County Hospital District, dated August 7, 1996, indicates that Morrow presented to the emergency department on his own to find help and to see "if he [had] a chem[ical] imbalance." Morrow, a police officer at the time, stated, "I need help—what can I do to find out what is wrong w[ith] me." The record indicated that Morrow exhibited depressive signs, he complained of having "Hi[gh]s" and "Lows," decreased appetite, weight loss, worry, and insomnia. Morrow admitted to having problems with depression for most of his life. The record further indicates that Morrow admitted to having an "extreme temper" and that he was separated from his wife due to his anger. Morrow did not then reveal any suicidal thoughts; he was prescribed trazodone and was released but was to follow up with the mental health clinic on August 20, 1996.

The next set of records dated October 1, 2012, from the Medical Center of McKinney, indicate that Morrow, a business own-

er in Princeton, was suicidal and was suffering from a drug overdose, intoxication, and an attempted suicide. Morrow was diagnosed with depressive disorder, was noted to be a longstanding alcoholic, and was transferred to the Medical Center of McKinney psychiatric services department.

The psychiatric services department (also called Green Oaks Behavioral Healthcare) reported that Morrow was suffering from major depressive disorder. The inpatient commitment form indicated that Morrow "is mentally ill" and, as a result, "is likely to cause serious harm to himself," that he is suffering from "severe and abnormal mental, emotional or physical distress and is deteriorating in his ability to function independently," and that he is "unable to make a rational and informed decision as to whether to submit to treatment." It was reported that Morrow took "Xanax plus Tegretol with Vodka." Morrow was discharged the following day with no medications having been prescribed.

The Fannin County Community Education Center records indicate that Morrow was seen for mental health services in September 2013 and was placed on suicide watch for three days.

**Analysis of Claims of Ineffective Counsel Due to Counsel's Failure to Investigate**

 Morrow's ineffective assistance of counsel claims presented during the motion for new trial proceedings are reviewed in accord with the standard set forth in *Riley v. State*:

> An appellate court reviews a trial court's denial of a motion for new trial for an abuse of discretion, reversing only if the trial judge's opinion was clearly erroneous and arbitrary. A trial court abuses its discretion if no reasonable view of the record could support the trial court's ruling. This deferential review requires

the appellate court to view the evidence in the light most favorable to the trial court's ruling. The appellate court must not substitute its own judgment for that of the trial court and must uphold the trial court's ruling if it is within the zone of reasonable disagreement. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."

*Riley v. State,* 378 S.W.3d 453, 457 (Tex. Crim.App.2012) (citations omitted) (quoting *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). "When the trial court denies a motion for a new trial alleging ineffective assistance of counsel, 'we view the relevant legal standards through the prism of abuse of discretion.'" *Lampkin v. State,* 470 S.W.3d 876, 903 (Tex. App.–Texarkana 2015, pet. ref'd) (quoting *Ramirez v. State,* 301 S.W.3d 410, 415 (Tex.App.–Austin 2009, no pet.)). We must therefore decide whether the trial court erred in determining that Morrow failed to meet the two-prong *Strickland* test.

 Morrow claims that counsel was ineffective because he failed to investigate facts relating to his mental health history that could have been used in mitigation of punishment at the sentencing phase of the trial. " 'The sentencing process consists of weighing mitigating and aggravating factors, and making adjustments in the severity of the sentence consistent with this calculus.' " *Milburn v. State,* 15 S.W.3d 267, 270 (Tex.App.–Houston [14th Dist.] 2000, pet. ref'd) (quoting *Vela v. Estelle,* 708 F.2d 954, 964 (5th Cir.1983)). Moreover, "[t]he sentencing stage of any case, regardless of the potential punishment, is "the time at which for many defendants the most important services of the entire proceeding can be performed." ' " *Id.* at 269 (quoting *Vela,* 708 F.2d at 964). While

"*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing," *Wiggins v. Smith,* 539 U.S. 510, 533, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), counsel is not in a position to make a reasoned decision to forego the presentation of mitigating evidence until he or she has evaluated that evidence to determine if it would be helpful. *Milburn,* 15 S.W.3d at 270. Conversely, " 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.' " *Wiggins,* 539 U.S. at 521, 123 S.Ct. 2527 (quoting *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052).

 Here, Morrow has alleged that there was scant evidence offered in mitigation of punishment regarding his mental health history and diagnosis. He claims that his best mitigating evidence of a long history of a major depressive disorder, including hospitalizations and medical records of the same, was not offered on his behalf at the punishment phase of the trial. Evidence offered in mitigation at the sentencing trial was very limited, consisting of the testimony of the owner of a beauty school Morrow attended, his mother Shelia, a church acquaintance, a family friend, and three of his children. Shelia offered the only testimony relating to Morrow's mental health, generally stating that Morrow had experienced a great deal of depression, especially during the time that Gina filed for divorce, that Morrow wanted to die, and that he had attempted suicide in the past. The remaining witnesses testified generally that Morrow would be a good candidate for community supervision, was responsible, followed rules, was a hard worker, and was a good father.

Although Fritts introduced mitigating evidence at the punishment trial, there was virtually no evidence presented regarding

Morrow's mental health history although there was substantial evidence that Fritts was well aware that Morrow had a history of mental health problems and that he did not investigate that history. As pointed out previously, Fritts indicated that he believed that the hazards of delving into that history were outweighed by the potential profit Morrow might realize from it. Fritts also believed that the testimony of a psychologist regarding a mental illness would have been more damaging than helpful because this type of testimony could have opened the door for the State to admit Morrow's statement (which was suppressed during the guilt/innocence trial) to the effect that his reason for having uttered his suicide threat was only to try to determine the degree of his wife's love for him. Fritts also said that he believed that while this evidence might initially appear mitigating, he indicated that a substantial portion of society believes that "suicide or the attempt thereof is actually a damnable sin." Fritts apparently never once considered the possibility that Morrow's mental health history could have influenced the jury to downwardly adjust the severity of the sentences ultimately imposed.

 Fritts' failure to investigate Morrow's mental health history can be characterized as reasonable trial strategy only if we conclude that " 'reasonable professional judgment[ ] support[s] the [decision not to further investigate that history].' " *Id.* at 533, 123 S.Ct. 2527 (quoting *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052). " 'Tactical decisions must be made in the context of a reasonable amount of investigation, not in a vacuum.' " *Lampkin,* 470 S.W.3d at 913 (quoting *Bouchillon v. Collins,* 907 F.2d 589, 597 (5th Cir. 1990)). Here, we cannot state that reasonable professional judgment supported Fritts' decision not to further investigate

Morrow's mental health history. *See Freeman v. State,* 167 S.W.3d 114, 118–19 (Tex.App.–Waco 2005, no pet.) (finding counsel ineffective for failing to discover defendant's mental health history); *Conrad v. State,* 77 S.W.3d 424, 426 n. 13 (Tex.App.–Fort Worth 2002, pet. ref'd) (" 'It must be a very rare circumstance indeed where a decision not to investigate would be "reasonable" after counsel has notice of the client's history of mental problems.' " (quoting *Bouchillon,* 907 F.2d at 597)). "Failure to uncover and present mitigating evidence 'cannot be justified as a tactical decision when defense counsel has not conducted a thorough investigation of the defendant's background.' " *Lampkin,* 470 S.W.3d at 913 (quoting *Shanklin v. State,* 190 S.W.3d 154, 164 (Tex.App.–Houston [1st Dist.] 2005, pet. dism'd)). Although there may have been some strategic reasons to not introduce some of that evidence, we can conceive of no valid reason for Fritts not to have taken the steps to arm himself with that information—irrespective of whether his ultimate decision was to not employ it. Consequently, we conclude that Fritts was deficient in failing to investigate Morrow's mental health history.

 We must now determine whether Morrow was prejudiced by counsel's deficient performance under the second prong of *Strickland.* For the punishment phase, our inquiry is whether there is a reasonable probability that the assessment of punishment would have been less severe in the absence of defense counsel's deficient performance. *Wiggins,* 539 U.S. at 534, 123 S.Ct. 2527; *Lair v. State,* 265 S.W.3d 580, 595 (Tex.App.–Houston [1st Dist.] 2008, pet. ref'd). Prejudice is established if the probability that the outcome would have been different is "sufficient to undermine confidence in the outcome" of

the proceeding. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

■ General factors to be considered in the evaluation of "whether a defendant has established *Strickland* prejudice during the punishment phase of non-capital cases as a result of deficient attorney performance of any kind" include whether the defendant received the maximum sentence, any disparity between the sentence imposed and the sentence requested by the respective parties, the nature of the offense charged, the strength of the evidence presented at trial, the egregiousness of the error, and the defendant's criminal history. *Lampkin,* 470 S.W.3d at 922. As stated in *Lampkin,*

> [w]here deficient performance arises from counsel's failure to investigate and introduce mitigating evidence, ... (2) the nature and degree of other mitigating evidence actually presented to the jury at punishment, (3) the nature and degree of aggravating evidence actually presented to the jury by the State at punishment, (4) whether and to what extent the jury might have been influenced by the mitigating evidence, (5) whether and to what extent the proposed mitigating evidence serves to explain the defendant's actions in the charged offense, and (6) whether and to what extent the proposed mitigating evidence serves to assist the jury in determining the defendant's blameworthiness.

*Id.*

Here, Morrow was sentenced to twenty years' confinement and fined $10,000.00 for his conviction of burglary of a habitation with intent to commit a felony.[3] Neither the State nor defense counsel argued for any particular sentence. Although Mor-

row broke into the home of his estranged wife in the early morning hours while brandishing a gun and a knife and with the intent to commit the felony offenses of kidnapping and aggravated assault and although he threatened three people with death after he had forcibly entered the house, he received a prison sentence on the low end of the sentencing range for this violent crime. Society as a whole has a strong aversion to anyone breaking into a home and terrorizing the inhabitants, and Texans have a strong attachment to the sanctity of the home. The State developed very strong evidence of the commission of this crime at trial. The fact that Morrow was assessed with only a twenty-year sentence and a fine of $10,000.00 weighs heavily in favor of a finding that there was no prejudice to Morrow in Fritts' failure to investigate Morrow's prior mental health problems for presentation as mitigation.

■ The egregiousness of the error is another factor we must weigh. This essentially means "the relationship between the amount of effort and resources necessary to have prevented the error as compared to the potential harm from that error." *Id.* at 919. With Morrow's cooperation, Fritts could have easily obtained the medical records to which Morrow has made reference. Even without Morrow's consent, those records could have been subpoenaed (although that tactic would have alerted the State to their existence). As previously discussed, the records contained evidence which might have served to mitigate Morrow's conduct in the eyes of the jury. Aristotle has pointed out that a person who acts in ignorance is not always excused from his actions. Here, Fritts simply did not

---

**3.** The punishment range for this first degree felony is imprisonment "for life or for any term of not more than 99 years or less than 5 years" and the possibility of a fine not to exceed $10,000. TEX. PENAL CODE ANN. § 12.32(a) (West 2011).

know what information his diligence in searching the content of those records might have revealed. Overall, this factor weighs in favor of a finding of prejudice.

Even though the records were not obtained by Fritts and were not evaluated by an expert for possible trial testimony,[4] there was not a complete absence of mitigating evidence. Seven witnesses were called at the punishment trial on Morrow's behalf. These witnesses variously described Morrow as being a responsible, hardworking man who is a good father. This mitigating evidence was slight, though, when contrasted with aggravating evidence introduced by the State in the form of testimony from each of Morrow's three former wives. Each of those former wives described Morrow as having previously acted on memorable occasions both abusively and violently. One former wife described a particularly violent episode during which Morrow choked her unconscious as she held her ill three-year-old child in her arms. This same woman also testified that Morrow had threatened to kill her and that she was forced to escape him by crawling through a window of their home. The State also offered evidence of Morrow's (quite minimal) criminal history, which did not include conviction of any felony offenses. The fact that there could have been some evidence available of Morrow's prior psychological problems to temper or partially explain this violent and abusive behavior may weigh somewhat in favor of a finding of prejudice.

To the extent possible, we are to likewise determine whether the jury might have been influenced by the mitigating evidence and (if there was such an influence), the degree to which that evidence would have influenced the jury in its decisions. The jury may well have been influenced by this evidence, as it reveals Morrow's long and unfortunate history of depression, suicidal tendencies, and his dependence on alcohol. The evidence not obtained by Fritts further reveals that Morrow never received any type of sustained medical or psychological help for his problems, which appeared to have grown increasingly onerous over time. The jury might have viewed this evidence, at least to some extent, as providing a useful and meaningful context in which to evaluate Morrow's actions in the charged offense. These factors weigh slightly in favor of a finding of prejudice.

One must note that burglary of a habitation with the intent to commit a felony other than felony theft is a first degree felony. TEX. PENAL CODE ANN. § 30.02(d). The penalty range for a first degree felony ranges from imprisonment for life or for a period of not less than five years nor more than 99 years, together with a fine not to exceed $10,000.00. TEX. PENAL CODE ANN. § 12.32. Given the overall, more or less, even balance of the factors analyzed, and in particular light of the fact that Morrow received a relatively short sentence of twenty years' imprisonment within the overall sentencing range even after the egregious conduct he displayed, we cannot say there is a reasonable probability that the assessment of punishment would have been less severe in the absence of defense counsel's deficient performance. *See Wiggins,* 539 U.S. at 534, 123 S.Ct. 2527. Accordingly, we overrule this point of error.

 Morrow's final claim of ineffective assistance of counsel rests on his assertion that Fritts did not investigate the possibility of raising an insanity defense. "Under *Strickland,* an attorney has the duty 'to make reasonable investigations or

---

4. Appellate counsel requested the appointment of an expert to evaluate Morrow's mental health records. The trial court denied that request.

to make a reasonable decision that makes particular investigations unnecessary.' " *Conrad,* 77 S.W.3d at 426 (quoting *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052).

To establish legal insanity, it is not enough for the defendant to show that he is mentally ill; the defendant must show that at the time of the charged conduct, he suffered from a severe mental disease or defect which resulted in his not knowing that his conduct was wrong. *See* Tex. Penal Code Ann. § 8.01(a) (West 2011). Although Fritts readily admitted that he did not investigate the factual basis for an insanity defense, he testified that he did not believe Morrow was insane at the time of the offense and that he did not request the appointment of an expert to review for a possible insanity defense because there was no evidence in the record other than his threat to commit suicide that would show that Morrow even suffered from a mental illness. Nonetheless, Fritts was advised by Shelia that immediately prior to the offense, Morrow was suffering from "weeks" of sleep deprivation and depression, and that "he [was] not thinking straight." It is apparent that Fritts had an obligation personally to investigate Morrow's mental status at the time of the offense. By his own admission, he did not do so. We can conceive of no trial strategy that would justify this failure. *See Bouchillon v. Collins,* 907 F.2d 589, 597 (5th Cir.1990) ("It must be a very rare circumstance indeed where a decision not to investigate would be 'reasonable' after counsel has notice of the client's history of mental problems.").

Even though Fritts failed in his duty to investigate Morrow's mental health status at the time of the offense, there is no evidence in the record to support a finding that it is reasonably probable that, but for counsel's deficiency, the result of the trial would have been differ-ent. Here, Morrow has not pointed to any evidence in the record that establishes that he was insane at that time. "If the accused knows that his conduct is 'illegal' by societal standards, then he understands that his conduct is wrong, even if, due to a mental disease or defect, he thinks his conduct is morally justified." *McAfee v. State,* 467 S.W.3d 622, 636 (Tex.App.–Houston [1st Dist.] 2015, pet. ref'd). Consequently, evidence of even extensive psychological problems alone is not sufficient to establish legal insanity at the time of the offense. *Id.; see Nutter v. State,* 93 S.W.3d 130, 132 (Tex.App.–Houston [14th Dist.] 2001, no pet.). When there is no evidence that an appellant was insane at the time of the offense, a counsel's failure to pursue such a defense cannot prejudice the defense. *See Brown v. State,* 129 S.W.3d 762, 767 (Tex.App.–Houston [1st Dist.] 2004, no pet.); *Conrad,* 77 S.W.3d at 426–27 (cases holding counsel's failure to pursue an insanity defense did not prejudice defense when despite history of mental illness, there was no evidence showing appellant's insanity at time of offense). The very fact that Morrow fled the scene when he saw flashing police lights in the distance is some indication in this case that he knew what he was doing was wrong.

We overrule this point of error.

## No Error in Failing to Conduct Informal Competency Evaluation

Morrow's attorney advised the trial court during the punishment phase of the trial that:

> [C]onsidering this and the way things have gone, despite advice and admonitions to the contrary from the Court— not just from me, but from the Court, I almost feel like I am—well, no, I don't. I feel like I must move for the Court to consider that the defendant may very well be mentally ill.

Now it seems that there is a—in my—in my—

5. This comment was made immediately after the State played a recording of a jail house telephone conversation between Morrow, Shelia, Marissa, and family friend Christina Lemons, pertinent portions of which are transcribed below:

THE DEFENDANT: Okay. I need you to pray real hard. Okay?

MANDI MORROW: Okay.

THE DEFENDANT: All right. I love you.

MANDI MORROW: Love you.

THE DEFENDANT: Let me talk to Mimi.

MANDI MORROW: Okay.

. . . .

THE DEFENDANT: Hey. Anyway, y'all just pray as hard as you can. That's all I've got to say. I don't know that it'll do any good because, like I said, I thought some things went real good this week and I thought—

SHEILA MORROW: And I thought they went good today. I was really proud of Joey.

THE DEFENDANT: I thought he—I thought he should have laid down on some things and—and really drop the hammer on it and I didn't feel like he did.

SHEILA MORROW: I thought he did good. I thought he hit on some really good points.

THE DEFENDANT: Like I said, I didn't think that all week, didn't think that, but I don't—I don't understand why they happened. It did not—

SHEILA MORROW: We've been praying—we've been praying that God would shut the mouths—the lying mouths of your enemies. You know what? We saw it the first day when all those lying cops were out there and doing their thing.

THE DEFENDANT: Yeah.

. . . .

SHEILA MORROW: She was the—the rape-victim advocate. And she was like, "We heard you talking about us." And I said, "I beg your pardon." I said, "I had the police officer over here and I was talking to him, for your information." And I said, "Ma'am, if you don't turn around and mind your own business and quit trying to start something, I'm going to report you." And so, about that time she jumps off the table and runs in there to the district—next thing I know, Mr. Mighty Mouse Sheriff is in there with a couple of his deputies, and I

THE COURT: You mean based on what we've just heard? [5]

said, "and get the police officer in here that we talked to." And then Joey came out asked me what was happening, and I told him. And I said Brandy Rock.

Well, he went and checked because he went and talked to Brandy Rock, and he said, "That's not Brandy Rock." He said that's—and he said, "That explains why she did what she did." And I said, "Well, Joey, there wasn't any talking about her at all." And so, that kind of died down, but—

THE DEFENDANT: That—I mean, I know that that—you might see that as. God doing something, but that ain't doing nothing for me. You know, I mean, I don't know what kind of stuff you're saying—

. . . .

SHEILA MORROW: Chris, I said something to Joey this afternoon about it. He said he didn't know how long it was going to take with the jury. He didn't know, you know, exactly when they would start doing anything yet. I—I did get with him.

I mean, there's a lot of people praying. I mean, The 700 Club's had you on prayer list all last week and this week. We call every morning.

THE DEFENDANT: (Inaudible.) Two years of that hasn't really done—hasn't really done—(inaudible).

SHEILA MORROW: You know, quit trying to discourage me. You know what, that—right now that's all I've got because I don't have you to have faith.

THE DEFENDANT: I need you to stop talking bad on this phone because they already brought that into court once.

SHEILA MORROW: Oh. Brought what into court, Chris?

THE DEFENDANT: Go ahead. Keep doing it after I told you not to.

SHEILA MORROW: Goodbye, Chris. Here's Christina.

CHRISTINA LEMONS: Hey.

THE DEFENDANT: She don't get it. And I told her to stop talking bad on this phone. They already brought it into court once. She just don't get it. She cannot control her mouth. I don't know—she's going to feel real bad tomorrow.

SHEILA MORROW: (Inaudible) to see that they haven't been trying to disbar me as a witness, then you're crazy.

THE DEFENDANT: Okay. You're going to see tomorrow when they bring this up.

MR. FRITTS: Well, based on that and based on the trial and—and the fact that if the Court will recall, we had a massive hearing of all these people when there was a question about whether something was said, and the Court admonished every witness, as I remember, admonished the defendant—or at least the defendant was present during that hearing.

It appears to me that somehow there is a considerable fetish or—or maybe not a fetish, but a belief in this idea that God is going to do something. And in my experience, sometimes mentally-ill people tend to have these kinds of religious complexes, and just out of a matter and abundance of caution, I'm going to move that the Court consider that. The Court may deny my motion, but I just don't know what else to do in that situation.

I'm afraid I can't—I can't put it on—put—I cannot specifically say what it might be other than that. It's just that it makes no sense that someone would constantly—

THE COURT: Not follow what they've been told, Mr. Fritts?

MR. FRITTS: Yes, when it's so—

THE COURT: I've been on the bench for ten years. This isn't a first, Mr. Fritts.

MR. FRITTS: Very well, Your Honor. I just, I—I feel, out of an abundance of caution, I should make that motion[.]

THE COURT: I don't see anything to ind—to support any issues of mental illness such that the defendant would be—lack competence, and nothing in that regard has been said. But there's nothing supported in the record because somebody refuses to follow the Court's instruction. That doesn't rise to that level. I think everybody I had to revoke on probation would have to be found mentally incompetent, Mr. Fritts, if that was the standard and it's not the standard. So whatever your motion was, it's going to be denied.

 "We review a complaint that the trial court erred in not conducting an informal competency inquiry for an abuse

Okay. That's what's going to have to happen, that you're going to have to learn the hard way. Just like you do everything else, you've got to learn the hard way. You're going to learn the hard way tomorrow.

SHEILA MORROW: Well, then, I won't testify tomorrow then, huh?

THE DEFENDANT: I—I don't think it's—I don't think it's going to matter. They're—they're going to start playing a whole bunch of stuff that you ain't prepared for tomorrow.

SHEILA MORROW: I really don't think Joey would put me in there if that was going to happen.

THE DEFENDANT: I'm telling you right now they've already said it's going to happen. I'm trying to tell you and you just won't listen to nothing I'm saying. You never have. This is going to happen. They're—they're fixing to hammer me with your mouth. I'm trying to tell you. I guess it's going to have to be proven to you. You have to learn it the hard way. Wait and see.

SHEILA MORROW: Then I'm telling Joey I'm not testifying.

THE DEFENDANT: Okay. Well, do whatever you need to do. They're—it's still not going to stop them from playing all the crap that you've said on the phone.

. . . .

CHRISTINA LEMONS: We've got prayer going out everywhere. We call everybody every day.

THE DEFENDANT: Well, I appreciate it.

CHRISTINA LEMONS: All through the day.

THE DEFENDANT: I thought—I told her I thought some good things happened this week and I was sure that God was doing something and it—it looks like He did do some things, but it looks like He didn't—He didn't do enough.

of discretion." *Jackson v. State*, 391 S.W.3d 139, 141 (Tex.App.–Texarkana 2012, no pet.). A person is "presumed competent to stand trial and shall be found competent to do so unless proved incompetent by a preponderance of the evidence." TEX. CODE CRIM. PROC. ANN. art. 46B.003(b) (West 2006). " '[A] person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense, may not be subjected to trial.' " *Turner v. State*, 422 S.W.3d 676, 688–89 (Tex.Crim.App.2013) (quoting *Drope v. Missouri*, 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975)).

■ "Under our current statutory scheme, any 'suggestion' of incompetency to stand trial calls for an 'informal inquiry' to determine whether evidence exists to justify a formal competency trial." *Id.* at 691–92 (footnote omitted). A suggestion of incompetence

> may consist solely of a representation from any credible source. A further evidentiary showing is not required to initiate the inquiry, and [a] court is not required to have a bona fide doubt about the competency of [a] defendant. Evidence suggesting the need for an informal inquiry may be based on observations made in relation to one or more of the factors described by Article 46B.024 or on any other indication that the defendant is incompetent within the meaning of Article 46B.003.

TEX. CODE CRIM. PROC. ANN. art. 46B.004(c–1) (West Supp.2015). Those factors include whether the defendant is able to

> (A) rationally understand the charges against [him] and the potential consequences of the pending criminal proceedings; (B) disclose to counsel pertinent facts, events, and states of mind; (C) engage in a reasoned choice of legal strategies and options; (D) understand the adversarial nature of criminal proceedings; (E) exhibit appropriate courtroom behavior; and (F) testify.

TEX. CODE CRIM. PROC. ANN. art. 46B.024(1) (West Supp.2015).

■ Here, in testifying at Morrow's motion for new trial, Fritts explained that Morrow understood the roles of his defense counsel, the prosecutor, and the judge, that he comprehended the operations of the court, that he grasped the charges arrayed against him and the potential penalties of those charges, and that he assisted in his defense (even to the extent of filing some of his own motions). Morrow does not contend that he could not consult intelligently with his attorney or that he failed to understand the proceedings against him. Instead, Morrow contends that the issue of competency was raised by his behavior and attitude during the course of the proceedings, as previously outlined. As illustrative of this behavior and/or attitude, Morrow relies on a recorded telephone conversation played for the jury, which potentially indicates that Morrow may have violated the court's previous instructions regarding conversations with people who were expected to testify at trial. At least, this complaint appears to form part of the basis of counsel's concern, i.e., that Morrow could not follow the trial court's instructions. Counsel further suggests that based on the recorded telephone conversation, Morrow may have a religious complex.

The failure to follow the instructions of the trial court (if this indeed occurred) is insufficient to suggest that Morrow might have been incompetent to stand trial. *See, e.g., Turner*, 422 S.W.3d at 689–90 (defendant's disagreement with trial counsel on "how most effectively to pursue his defense" does not suggest incompetency). The concern that Morrow might have a

religious · complex fails to suggest that Morrow was, based on this record, incompetent. Neither the contents of the recorded telephone conversation nor counsel's comments to the trial court suggest that Morrow was unable to understand the proceedings against him or to rationally engage with counsel regarding the defense of the case. Because there was no suggestion that Morrow was incompetent, the trial court did not abuse its discretion by not conducting an informal competency inquiry under Article 46B.004(c). We overrule this point of error.

### Claim of Improper Admission of Hearsay Evidence

■ Morrow complains of numerous statements admitted over his hearsay objections during the guilt/innocence phase of the trial. The first set of statements were made by Mangum to Sergeant Praslicka of the Fannin County Sheriff's Office following the break-in and the arrival of law enforcement officers to investigate the resulting 9-1-1 calls. Praslicka testified that he was dispatched to the scene of a possible burglary in progress at approximately 3:00 a.m. on what turned out to be the residence of John Belmont just north of Bonham. Belmont had been awakened by a noise at the back door and believed that someone was attempting to break into his house. As he went to the back door, Belmont observed a man wearing only shorts. Praslicka located the suspected burglar, who was bleeding and had abrasions all over his body. The suspected burglar appeared to be frightened and stated that he was threatened and had a

gun pointed at him while at a nearby residence. When Praslicka was asked what the man said, Morrow objected on the basis that whatever the man (later identified as Mangum) said, "that's not an excited · utterance." This objection was overruled by the trial court, and Praslicka stated that Mangum "advised that the— one of the other victims—her estranged husband had broke into the house and threatened to—threatened to kill him with a gun."

The arguments of Morrow and the State at trial and on appeal are like two darkened ships passing in the night, each unaware of the existence of the other.

■ It is apparent that the basis of Morrow's objection at trial was that of hearsay.[6] While Morrow summarily asserts in his appellate brief that this statement is hearsay, he further claims that the statement is inadmissible because it exceeds the scope of marginal "background" evidence.[7] The State maintains that the statement falls within the excited-utterance exception to the rule against the admission of hearsay.

■ Indeed, there was no claim by the State at trial that this statement was not hearsay, but was instead, merely background evidence. At trial, Morrow made no claim that this statement exceeded the permissible scope of background evidence. Because this objection was not made at trial, we may not address it on appeal. "The point of error on appeal must correspond or comport with the objection made

---

6. Rule 802 of the Texas Rules of Evidence generally provides that hearsay is not admissible. Tex. R. Evid. 802. " 'Hearsay' means a statement that ... the declarant does not make while testifying at the current trial or hearing" and which is offered "to prove the truth of the matter asserted in the statement." Tex. R. Evid. 801(d).

7. An "out-of-court statement may be admissible, though testimonial, if it is *not* offered for the truth of the matter asserted, but only to supply 'background,' e.g., to provide the investigative context in order to explain police conduct." *Langham v. State*, 305 S.W.3d 568, 577 (Tex.Crim.App.2010) (citing *United States v. Cromer*, 389 F.3d 662 (6th Cir.2004)).

at trial." *Wright v. State,* 154 S.W.3d 235, 241 (Tex.App.–Texarkana 2005, pet. ref'd) (citing *Dixon v. State,* 2 S.W.3d 263, 273 (Tex.Crim.App.1998) (op. on reh'g)). "Where a trial objection does not comport with the issue raised on appeal, the appellant has preserved nothing for review." *Id.*; *see* Tex. R. App. P. 33.1. At trial, Morrow only objected on the grounds of hearsay. On appeal, Morrow likewise raises a cursory complaint that this statement—and others like it—are hearsay. Although Morrow did not brief the alleged hearsay nature of the referenced statement, and likewise did not brief the issue of whether it qualifies as an exception to the hearsay rule, we nevertheless address this point of error in the interests of justice.

■■■■ "The admissibility of an out-of-court statement under the exceptions to the general hearsay exclusion rule is within the trial court's discretion." *Zuliani v. State,* 97 S.W.3d 589, 595 (Tex.Crim.App. 2003) (citing *Lawton v. State,* 913 S.W.2d 542, 553 (Tex.Crim.App.1995), *overruled on other grounds by Mosley v. State,* 983 S.W.2d 249 (Tex.Crim.App.1998)). Unless there is a clear abuse of discretion, we will not reverse the trial court's ruling pertaining to a hearsay objection. *Id.* A trial court abuses its discretion when its decision " 'was so clearly wrong as to lie outside that zone within which reasonable persons might disagree.' " *Id.* (quoting *Cantu v. State,* 842 S.W.2d 667, 682 (Tex. Crim.App.1992)). Further, when the trial court does not plainly state the basis for admission of a statement subject to a hearsay objection, we will uphold the decision to admit the evidence "if it is correct on any theory of law applicable to the case." *Penry v. State,* 903 S.W.2d 715, 750 n. 34 (Tex.Crim.App.1995) (per curiam) (citing *Romero v. State,* 800 S.W.2d 539, 543 (Tex. Crim.App.1990)). Because the statement was properly admitted as an excited utterance under Rule 803(2), we need only address the admissibility of the evidence under that rule. *See Penry,* 903 S.W.2d at 750.

■■■■ "A statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused" is classified as an exception to the rule against hearsay. Tex. R. Evid. 803(2). The basis for the excited-utterance exception is " 'a psychological one, namely, the fact that when a man is in the instant grip of violent emotion, excitement or pain, he ordinarily loses the capacity for *reflection* necessary to the fabrication of a falsehood and the "truth will come out." ' " *Zuliani,* 97 S.W.3d at 595 (quoting *Evans v. State,* 480 S.W.2d 387, 389 (Tex.Crim.App.1972) (emphasis added)). We have previously summarized the law governing applicability of the excited-utterance exception:

> "For the excited-utterance exception to apply, three conditions must be met: (1) the statement must be a product of a startling occurrence that produces a state of nervous excitement in the declarant and renders the utterance spontaneous and unreflecting, (2) the state of excitement must still so dominate the declarant's mind that there is no time or opportunity to contrive or misrepresent, and (3) the statement must relate to the circumstances of the occurrence preceding it."

*Juarez v. State,* 461 S.W.3d 283, 295 (Tex. App.–Texarkana 2015, no pet.) (quoting *Goodman v. State,* 302 S.W.3d 462, 471–72 (Tex.App.–Texarkana 2009, pet. ref'd) (citing *Sellers v. State,* 588 S.W.2d 915, 918 (Tex.Crim.App. [Panel Op.] 1979); *Mumphrey v. State,* 155 S.W.3d 651, 663 (Tex. App.–Texarkana 2005, pet. ref'd)).

Here, the evidence established that Praslicka encountered Mangum only a

short time after Morrow had invaded Gina's home and held Gina, Marissa, and Mangum at gunpoint for approximately twenty minutes. Morrow repeatedly threatened to kill Gina and everyone in the house, including Mangum. He assaulted Mangum and humiliated him by having him drop his boxer shorts. Morrow told Mangum that if he did not shut up, he would kill him and smoke the house.[8] Eventually, Morrow had Mangum, Gina, and Marissa form a line to walk outside. When Morrow was distracted by Marissa's request for a cigarette, Mangum ran out of the front door, wearing only his boxer shorts. After running into a barbed-wire fence, falling into a pond, and running into a tree, Mangum finally reached a neighboring house in the rural countryside. When Mangum approached that first house, the homeowner opened the door holding a shotgun and told Mangum to leave his property or he would be killed. Mangum complied with that demand and left, approaching a second house, where he ultimately hid underneath a bush when the homeowner let his dogs out. When the state troopers arrived, Mangum emerged with his hands in the air. At that point, Mangum told Praslicka "what was going on over at the house."

While it is unclear how much time elapsed from the point of Mangum's escape to his encounter with Praslicka, it is apparent that Mangum was emotionally distressed from the entire incident by the time of that encounter. Praslicka testified that when he encountered Mangum, Mangum was "frightened and scared" due to the events of the evening, including Morrow's break-in and repeated threats to kill Mangum and the others. Having just fled for his life, repeatedly encountering obstacles and covered in cuts and abrasions,

Mangum, plainly frightened, told Praslicka what had happened to him. It was reasonable for the trial court to conclude that Mangum, when speaking with Praslicka, was still under the effect of the fear and trauma caused by Morrow. We find no error in the admission of Praslicka's statement.

Deputy Kaleb Hackney of the Fannin County Sheriff's Office testified that he likewise responded to a burglary call. As he was speaking with the caller, Mangum came out of the woods with his hands in the air. Hackney was permitted to testify, over Morrow's hearsay objection, that Mangum told him that a strange man came into the residence and "he had just been held at gunpoint, and he ran away from the man in which at that point, that's what made him scared, along with the fact of the gentleman at the residence pulling a gun on him." For the reasons previously articulated, we find no error in the admission of Hackney's statement.

 Morrow further complains of several statements Gina made to Praslicka following the incident at the rural Ivanhoe residence. Praslicka explained that after he spoke briefly with Mangum, he received a call from Gina at approximately 3:18 a.m., reporting a suicidal subject (Morrow) on County Road 2230.[9] Praslicka proceeded to travel to County Road 2230, arriving there in approximately fifteen minutes after he received the call. Praslicka testified that when he arrived at the residence, Gina was weeping, visibly upset, and frightened over what had occurred at the house. While in this state, Gina described the events of the break-in and its aftermath. Morrow objected to a number of these statements as hearsay, each of which was overruled by the trial court. Morrow

---

8. There were children sleeping in the living room.

9. Before he left the residence, Morrow told Gina that he was going to kill himself.

complains of the trial court's ruling with respect to the following statements Gina made to Praslicka:

> She advised that her ex-husband had broken in through the—forced his way into the entrance through a back window to the garage, had entered her bedroom, had turned on the lights, and pointed a gun at herself and the white male who was identified as Donny Ma[ng]um, forced them to get out of the bed and threatened them with a gun.

> ....

> [Gina] Morrow told me that as they approached the front door of the residence, her daughter had asked to get a cigarette before they stepped outside, at which point Donny was able to escape out the front door and to the neighbor's house on FM 273.

> ....

> She advised that he had ordered her daughter—I believe her name was Marissa—to stay on the porch while he forced the victim, Gina Morrow, to go to the truck that was parked in front of the residence.

> ....

> She advised that the suspect had forced her into the house—into the vehicle, at which point he then forced her to perform oral sex on him.

> ....

> She advised that while they were still in the vehicle, the suspect had saw our lights at the neighbor's house and made a threat towards her that if she had called the police, that she would—that he would kill her.

Each of these statements was made within a relatively short time after the break-in and Mangum's escape. And, although the statements were made in response to "three or four" questions, the excited-utterance exception to the rule against hearsay does not require that the statements be extemporaneous. *See Zuliani*, 97 S.W.3d at 596 (fact that statements were in form of responses to questions does not make them inadmissible under excited-utterance exception to hearsay rule). Moreover, these statements were made in the aftermath of several traumatic events— Morrow had broken into Gina's home and held Gina, Marissa, and Mangum at gunpoint. He threatened to kill them. After Mangum escaped, Gina was sexually assaulted in the cab of her truck, in full view of Marissa. As Gina spoke with Praslicka, Morrow called her cell phone several times, threatening suicide. These calls interrupted Praslicka's ability to speak with Gina, who was upset about what Morrow was telling her.[10] Consequently, Gina continued to experience a state of nervous excitement after the original traumatic events, due to the continued bombardment of distressing and upsetting telephone calls from Morrow. Based on this evidence, we cannot say that the trial court incorrectly determined that Gina was "still dominated by the emotions, excitement, fear, or pain of the event." *Lawton*, 913 S.W.2d at 553.

We overrule this point of error.

Morrow next complains, multifariously, of several statements admitted over his hearsay objections during the trial's punishment phase. In the interests of justice, we will address these complaints.

Morrow initially complains of a statement made by Gina regarding a "third party female she purportedly read on Chris[ Morrow's] phone, in which the female was telling [Morrow] how much she

---

10. Gina testified that Morrow began calling her "constantly" after he left the scene. The first call came just minutes after he left. Morrow wanted to know if Gina still loved him and asked her to "[p]lease call the cops off of [him]."

loved and missed him." At trial, Morrow interposed a hearsay objection to the question, "Did you see any communications from [Morrow] to someone else on those—on that phone?" The trial court correctly overruled this objection, as the question did not call for a hearsay response. The question merely asked whether any conversations existed and not what the statements actually were. Morrow did not object when Gina testified to the substance of those communications. Accordingly, nothing has been preserved for our review on this issue. *See* Tex. R. App. P. 33.1.

Next, Morrow complains that his hearsay objection to testimony from Gina regarding a confrontation with Morrow about what third parties were "telling her" should have been sustained. Gina was asked to state, "without saying specifically what these women told you, what—how did it affect your judgment or your behavior or your actions?" Morrow's hearsay objection was interposed immediately after Gina's response:

> So, in March, when we went to divorce court, I—we were texting back and forth that day and he asked to meet up and I agreed to do it. And when I met up with him, you know, I didn't give him a lot of details because these people didn't want their names given, but everything that had happened was matching up in the timeframes and there were—these women had pictures and—

Again, the trial court properly overruled Morrow's hearsay objection. This statement merely relates the fact that Gina spoke with Morrow when the two went to divorce court. She did not relate any information regarding what, if anything, "these women" might have told her.

11. In his brief, Morrow identifies this witness as Susan Morrow. The referenced testimony,

Next, Morrow contends that Jenene McMillan "was allowed to testify over a hearsay objection that she had a conversation with Gina Morrow about Mr. Morrow's 'status in the marriage, his fidelity.' "[11] The question posed was "Did you talk at all about the defendant's status in the marriage, his fidelity, his statements that he made to you? Did you give her kind of—any of that insight?" At this point, Morrow objected to hearsay; and the court overruled the objection, instructing the witness, "You may answer just whether or not you had that type of a conversation." Jenene responded, "Yes, we did have some of that conversation." The State asked the witness whether she had ever had such a conversation with Gina, but did not ask for the substance of the conversation. Moreover, the trial court specifically instructed the witness that she could answer only whether such a conversation took place. Because no out-of-court statement was offered, no hearsay was uttered.

Morrow also complains of Jenene's testimony, over his hearsay objection, that "Morrow had been on a Plenty of Fish dating website." The series of questions leading to this objection were as follows:

> Q. .... And were you aware of any online presence that the defendant had at that time?
>
> A. Yes.
>
> Q: And did you show that to [Gina]?
>
> A. Yes, I did.
>
> Q. What did you show her?
>
> MR. FRITTS: Objection, hearsay.
>
> THE COURT: Overruled.

however, was that of Jenene McMillan.

A. .... There was—he had a site—I believe it was Plenty of Fish that he had been active on.

It is doubtful that Morrow's mere presence on a website, without more, is the sort of non-verbal conduct that could reasonably be considered a statement, especially in light of the fact that there is no evidence that Morrow intended this to be a statement. *See* TEX. R. EVID. 801(a) (statement includes nonverbal conduct if conduct is intended as substitute for verbal expression). Moreover, even if Morrow's website presence could be considered a statement, any such statement would nevertheless be admissible against Morrow as a party opponent. *See* TEX. R. EVID. 801(e)(2)(A).

Finally, Morrow complains of the admission of Claudia Ramirez' testimony, over his hearsay objection, that "her children ran away, and upon being found her son said he did not want to live with [Morrow] anymore because he was 'mentally abusive' to them." Claudia testified about an occasion during her marriage to Morrow when her children went to school and never returned. When the children were eventually located at her sister's house, Claudia's son was "very emotional," and she testified that he said he "couldn't take living with [Morrow] anymore." There was no objection raised to this testimony. Claudia was next asked whether her son said "anything more about why?" At this point, Morrow objected to hearsay, and the State claimed the excited-utterance exception. The court then asked the State to lay the foundation for this exception. The following exchange ensued:

Q. .... So, did he seem to still be under the stress of the events that caused him to run away?

A. Yes.

....

Q. .... So, while he was still in that emotional state about running away, did he tell you anything about why he'd done it?

A. He said that [Morrow] would be very abusive with—mentally when I was not around.

Morrow did not object when the last question was asked. The testimony given in response to this question is the subject of Morrow's appellate complaint. Since there was no objection voiced, there was no preservation of error—if error existed. *See* TEX. R. APP. P. 33.1.

## The Evidence is Legally Sufficient to Support Morrow's Burglary Conviction

In his final point of error, Morrow complains that the evidence is legally insufficient to support his burglary conviction. We disagree.

In evaluating legal sufficiency in this case, we must review all the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found, beyond a reasonable doubt, that Morrow committed the offense of burglary. *See Brooks v. State,* 323 S.W.3d 893, 912 (Tex.Crim.App.2010) (citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)); *Hartsfield v. State,* 305 S.W.3d 859, 863 (Tex.App.–Texarkana 2010, pet. ref'd) (citing *Clayton v. State,* 235 S.W.3d 772, 778 (Tex.Crim.App.2007)). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State,* 214 S.W.3d 9, 13 (Tex. Crim.App.2007) (citing *Jackson,* 443 U.S. at 318–19, 99 S.Ct. 2781).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State,* 953 S.W.2d 234,

240 (Tex.Crim.App.1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*; *see Allen v. State*, 436 S.W.3d 815 (Tex.App.–Texarkana 2014, pet. ref'd).

■ Earlier in this opinion, the conduct of Morrow at the house occupied by Gina and others was adequately described, and it would be redundant to repeat it. It is only required that we determine whether this conduct occurred at a place that would satisfy the statutory requirements of the crime with which Morrow was charged.

A person commits the offense of burglary if, without the consent of the owner, the person enters a habitation and commits or attempts to commit a felony, theft, or assault. TEX. PENAL CODE ANN. § 30.02(a)(3) (West 2011). Morrow only disputes the element of ownership. He claims that the State did not prove that he entered the home "without the consent of the owner," because he was a joint record owner and community property owner of the Ivanhoe home. This argument effectively boils down to the contention that one cannot burglarize his own residence.

■ "Owner" is defined in the Penal Code as a person who "has title to the property, possession of the property, whether lawful or not, or a greater right to possession of the property than the actor...." TEX. PENAL CODE ANN. § 1.07(a)(35)(A) (West Supp.2015). "'Possession' means actual care, custody, control, or management." TEX. PENAL CODE ANN. § 1.07(a)(39) (West Supp.2015). "Ownership of the burglarized premises may be proven in one of three ways: (1) title, (2) possession[,] or (3) a greater right

to possession than the defendant." *Alexander v. State*, 753 S.W.2d 390, 392 (Tex. Crim.App.1988). "Thus, under the Penal Code, any person who has a greater right to the actual care, custody, control, or management of the property than the defendant can be alleged as the 'owner.'" *Id.*; *Ramirez v. State*, 429 S.W.3d 686, 688 (Tex.App.–San Antonio 2014, pet. ref'd). Consequently, the State was entitled to prove Gina's ownership of the Ivanhoe home by showing that she had title to the home, possession of the home, whether lawful or not, or a greater right to possession of the home than Morrow. *See* TEX. PENAL CODE ANN. § 1.07(a)(35)(A); *Ramirez*, 429 S.W.3d at 688. "The Penal Code's definition of owner is 'expansive' and 'give[s] ownership status to anyone with a rational connection to the property.'" *Ramirez*, 429 S.W.3d at 688 (quoting *Garza v. State*, 344 S.W.3d 409, 413 (Tex.Crim.App.2011)). "Under the Penal Code's definition, multiple persons may be considered 'owners' of property, but only one need be alleged in the indictment." *Id.* (citing *Gregg v. State*, 881 S.W.2d 946, 951–52 (Tex.App.–Corpus Christi 1994, pet. ref'd)).

Here, the State alleges that it offered legally sufficient evidence to show that Gina had a greater right to possession of the Ivanhoe home than did Morrow. Gina testified that during the divorce proceeding, she and Morrow agreed that she would have possession of the home commencing in March 2013. In fact, Morrow moved out of the home pursuant to this agreement on March 16, and Gina thereafter occupied the home without him. Per the parties' agreement, Gina was permitted to occupy the home during the pendency of the divorce. Morrow concedes that he moved out of the residence pursuant to an agreement with Gina while their divorce was pending. At the final hearing,

the divorce court was to make final orders regarding property division.[12]

Although the evidence indicates that Morrow and Gina agreed that Gina would occupy the Ivanhoe home beginning on March 16, Gina testified that she did not continuously occupy the residence after March 16. She alternated staying with a girlfriend in Frisco and the Ivanhoe home. Gina testified, however, that on the evening of May 4 and the morning of May 5, 2013, she was occupying the home in Ivanhoe. Gina testified that she went to bed at approximately 1:30 a.m. on May 5, but before doing so, she checked all of the doors and windows to be sure they were locked. About an hour after she had gone to bed, Gina was awakened by Morrow, who was standing at the foot of her bed, pointing a gun at her. The evidence showed that although all of the windows and doors were locked when she went to bed, she later discovered that the door to the garage was unlocked and open, and a garage window had been broken.

This evidence is legally sufficient to prove that Gina had a greater right to the actual care, custody, control, or management of the property than did Morrow. Consequently, it is likewise legally sufficient to support Morrow's burglary conviction. We, therefore, overrule this point of error.

We affirm the trial court's judgment.

---

12. State's Exhibit 1, captioned "Motion for Temporary Orders," was introduced at trial. The motion, filed on behalf of Morrow in the divorce proceeding, states that "Petitioner and Respondent entered into an agreement on March 5, 2013 regarding Respondent vacating the marital residence for Petitioner to take possession and occupy." The motion was filed on March 28 and alleges, "Petitioner has yet to move back into the marital residence and Respondent is requesting a temporary order awarding the exclusive use of the marital residence to Respondent while the case is pending."