

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-17-00092-CR
_____

ALEXIS ELAINA WALKER, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 71st District Court
Harrison County, Texas
Trial Court No. 14-0403x

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Justice Burgess

# OPINION

After a jury found Alexis Elaina Walker guilty of murder, the trial court sentenced her to thirty years' confinement in prison. Walker has appealed the trial court's judgment, maintaining that the trial court (1) erred when it failed to include in its jury charge an instruction on the reasonableness of her use of deadly force, (2) erred during the punishment phase because it failed to include an instruction on the issue of sudden passion, and (3) erred when it assessed attorney fees against Walker. For the reasons below, we will modify the trial court's judgment by deleting the assessment of attorney's fees against Walker. In all other aspects, we affirm the trial court's judgment.

## I. Background

### A. Evidence at Guilt/Innocence Phase

Walker and her husband, Mark Anthony Updyke, went to a restaurant on the evening of November 28, 2014, where Walker had three mixed drinks. When they arrived home, Walker and Updyke went across the street where a group of their friends were sitting by a fire, and Walker drank four or five more shots of liquor. During that time, Walker made several trips to the neighbor's home in order to use the restroom, and her friend, Lindsey Tucker, went along with her each time. Updyke asked Walker if she had "something going on" with Tucker, which Walker understood as an accusation that she and Tucker were using cocaine. Walker and Updyke began to argue, and Updyke "stomped home" toward the couple's home across the street. At some point, Updyke took possession of Walker's car keys.

Walker followed Updyke, who continued to question her about the number of times Walker had gone inside the neighbor's home. When they arrived at their home, Updyke "roll[ed] a joint," and the pair continued arguing. After shoving Walker, Updyke left the mobile home and went back across the street to join the others.

While Walker was alone in the couple's home, she sent Updyke over forty text messages within a two-hour period, most of which were laced with profanity. In one message, Walker accused Updyke of having inappropriate relationships with married women, and she informed Updyke that she had messaged their husbands to apprise them of her beliefs. Walker repeatedly asked Updyke to return her keys, and Updyke replied, "Let me in and I want a kiss." Walker responded, "[expletive] off u come in and I will put a bullet inn [sic] you." When no response from Updyke was forthcoming, Walker messaged him that she was "setting [expletive] on fire."[1]

At that point, Updyke went back to the couple's home. Finding the door locked, Updyke proceeded to climb through a window of the home. Walker stated that she ran to her room and retrieved a gun that she had stored in a "gun box." Walker said she remembered raising the gun and shooting Updyke, but she did not remember shooting him four times. In actuality, Walker shot Updyke once in his chest and three more times in his back.

During her interview with the investigators, Walker described Updyke as being "mean." She stated that Updyke had been abusive to her in the past and that he had done so in front of the children, but that it had "been a while" since he had physically assaulted her. Walker said she did

---

[1]In addition to her text messages to Updyke, Walker also texted Charles Michael Sherrod, including one stating, "Don't text back, I'm finna kill him[.]" She also texted Tucker stating, "I'm gonna kill hhim [sic]."

not want other people to know about the alleged abuse because she "[had] children with [Updyke]." When asked if she was scared of Updyke, Walker explained that he had threatened to kill her in May by breaking her neck, but she questioned whether he would ever have followed through with his threat. According to Walker, she had more nerve than Updyke did "when [she had] been drinking." Walker claimed that, when she shot Updyke, she was attempting to protect herself and that she did not intend to kill him.

Walker also maintained that she was angry with Updyke because he had accused her of using cocaine that evening. When asked why she did not simply run out the front door when Updyke entered the home, Walker explained that, if she had left the house, Updyke would have locked her out of the home without her keys. Walker stated that Updyke was aware that she was in possession of a gun. Moreover, Walker knew that Updyke did not have a weapon because he had been convicted of a felony, and he was not allowed to have one in his possession.

### B.    Evidence at Punishment Phase

At the punishment phase of trial, Walker testified that her relationship with Updyke had always had its "up[s] and downs" and that they separated quite often. According to Walker, whenever they separated, she would find other places to live. Walker stated that Updyke first struck her when she was "probably five or six months' pregnant." Walker explained that Updyke's behavior did not "stand out to [her]" because she "was used to seeing it" when she was younger. Walker testified, "There were incidents [Updyke] would grab me by the throat. Numerous occasions of him taking me by the hair and pulling me off my feet. I've been kicked while I was down on the ground. I've been drug through the house." Walker stated that, during the last year

4

of their marriage, Updyke had been unfaithful, but she also conceded that she had been unfaithful as well.

Walker recalled sending several text messages to Updyke on the evening of the incident and also "throwing stuff out the windows." She testified, "I don't -- I can't tell you in what order I did those things. I just don't' know." Walker stated that, when Updyke sent the text message to her that he wanted a kiss from her, she "felt like that was a trick to get [her] to open the door." According to Walker, she had no plans to hurt, shoot, or kill Updyke that evening.

When asked what was going through her mind, Walker stated, "I can't -- I can't tell you exactly. I mean, I had been drinking so much that evening." Walker said that she was mad and upset at different times during the evening, but that she was scared "[o]nly when he came to the house." Walker stated that the only thing she wanted was to get her keys from Updyke. "I tried -- I tried everything. I begged him. I tried bargaining with him." Walker said the only reason she sent Updyke the text message about burning "stuff" was to convince Updyke to return her keys.

Walker stated that, initially, when Updyke came to the house, she was standing in the kitchen, Updyke remained outside the house, and they began to argue. According to Walker, Updyke then attempted to come through the window, and she tried to stop him by "pushing him down" "[w]ith both hands, trying to shove him back." When she could not stop him from coming inside, Walker ran to her room, thinking, "[O]h, [expletive], he's fixing to get me."

Walker said she retrieved the gun from her closet, removed it from the box, "and turned and fired." She continued, "And, I -- I can't tell you much more than that because I don't know." Walker said that she "didn't know what [Updyke] was going to do," but that she did not "want to

5

find out." According to Walker, she was afraid Updyke was "going to do something worse than he had ever done before[.]" Walker could not recall how many times she shot Updyke or where she shot him. Walker then began searching for her telephone. Eventually, she found her telephone in the kitchen and called 9-1-1.

## II.     The Trial Court's Jury Instructions

On appeal, Walker contends that the trial court's jury instructions contained error in both phases of the proceedings, maintaining that (1) during the guilt/innocence phase, she was entitled to an instruction regarding the reasonableness of her use of deadly force because Updyke was committing burglary when he unlawfully entered the home with the intent to assault her and (2) during the punishment phase, the trial court erred when it failed to include a jury instruction on the issue of sudden passion. For the reasons below, we disagree.

### A.     Standard of Review

The standard of review for jury charge error is the same regardless of whether error was alleged to have occurred during the guilt/innocence phase or the punishment phase. Our review of an alleged jury charge error involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). Initially, we determine whether error occurred; we then "determine whether sufficient harm resulted from the error to require reversal." *Id*. at 731–32; *see Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g). The level of harm that must be shown as having resulted from the erroneous jury instruction depends on whether the appellant properly objected to the error. *Abdnor*, 871 S.W.2d at 732.

6

When a proper objection is made at trial, a reversal is required if there is "some harm" "*calculated to injure the rights of defendant*." *Id.* (quoting *Williams v. State*, 547 S.W.2d 18, 20 (Tex. Crim. App. 1977)). But, when the defendant fails to object "to the charge, we will not reverse the jury-charge error unless the record shows 'egregious harm' to the defendant." *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005) (citing *Almanza*, 686 S.W.2d at 171). In determining whether the error caused egregious harm, we must decide whether the error created such harm that the appellant did not have a "fair and impartial trial." TEX. CODE CRIM. PROC. ANN. art. 36.19 (West 2006); *Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008); *Almanza*, 686 S.W.2d at 171; *Boones v. State*, 170 S.W.3d 653, 659 (Tex. App.—Texarkana 2005, no pet.).

"In order to preserve error relating to a jury charge, there must either be an objection or a requested charge." *Vasquez v. State*, 919 S.W.2d 433, 435 (Tex. Crim. App. 1996). Rule 33.1 of the Texas Rules of Appellate Procedure requires that a complaint be made "with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." TEX. R. APP. P. 33.1(a)(1)(A). "[N]o talismanic words are needed to preserve error as long as the court can understand from the context what the complaint is." *Clark v. State*, 365 S.W.3d 333, 337 (Tex. Crim. App. 2012).

Finally, a trial court is required to charge the jury on any defensive issue raised by the evidence, "regardless of its substantive character." *Brown v. State*, 955 S.W.2d 276, 279 (Tex. Crim. App. 1997). An accused "is entitled to an affirmative defensive instruction on every issue raised by the evidence regardless of whether it is strong, feeble, unimpeached, or contradicted, and

7

even if the trial court is of the opinion that the testimony" is not credible. *Id*. (quoting *Williams v. State*, 630 S.W.2d 640, 643 (Tex. Crim. App. 1982)). It is within the jury's purview to decide whether to accept or reject a properly raised defensive theory. *Woodfox v. State*, 742 S.W.2d 408, 409–10 (Tex. Crim. App. 1987).

**B.      Discussion**

### 1.      Guilt/Innocence Jury Instructions

Walker was charged with murder. A person commits the offense of murder if she:

> (1)      intentionally or knowingly causes the death of an individual;
> (2)      intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual;
> (3)      commits or attempts to commit a felony, other than manslaughter, and in the course of and in the furtherance of the commission or attempt, or in the immediate flight from the commission or attempt, [s]he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

TEX. PENAL CODE ANN. § 19.02(b) (West 2011).

Walker admitted shooting Updyke, but contends that she was acting in self defense and that her actions should have been presumed reasonable because Updyke was in the process of committing burglary at the time of the incident. At trial, Walker, in making her argument, stated,

> And I think also in addition to that, we would ask for the presumption language on -- or reasonable belief. It's presumed to be reasonable given the fact -- I just -- I want to make this argument -- hang on -- that she had locked her husband out of the house. She was in sole possession of the house at the time that -- there's evidence that he entered the house without her effective consent, and that entry was unlawful.
> And, therefore, he was in the process of committing burglary, and, therefore, we would be entitled to the presumption that he was in the process of committing burglary, as well as in the process of attempting to commit murder.
> And, therefore, her action, her reasonable belief that deadly force and self-defense is presumed to be reasonable.

8

Walker continued, "So my argument is, because she had locked him out of the house, because he was trying -- attempting to enter the house without her effective consent, that that constitutes unlawful entry." Because Walker asked the trial court to include the instruction at issue, if this Court determines that the trial court erred when it refused to grant Walker's request, "then reversal is required if the error is 'calculated to injure the rights of [Walker],' which means no more than that there must be *some* harm to the accused from the error." *Reeves v. State*, 420 S.W.3d 812 (Tex. Crim. App. 2013) (quoting *Almanza*, 686 S.W.2d at 171).

Our law provides that a person may use deadly force[2] to defend property under certain circumstances. Section 9.42 of the Texas Penal Code states as follows:

A person is justified in using deadly force against another to protect land or tangible, movable property:

> (1)     if he would be justified in using force against the other under Section 9.41;[3] and

---

[2]"Deadly force" is force "intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." TEX. PENAL CODE ANN. § 9.01(3) (West 2011).

[3]Section 9.41 states as follows:

> (a)     A person in lawful possession of land or tangible, movable property is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to prevent or terminate the other's trespass on the land or unlawful interference with the property.
> (b)     A person unlawfully dispossessed of land or tangible, moveable property by another is justified in using force against the other when and to the degree the actor reasonably believes the force is immediately necessary to reenter the land or recover the property if the actor uses the force immediately or in fresh pursuit after the dispossession and:
> > (1)     the actor reasonably believes the other had no claim of right when he dispossessed the actor; or
> > (2)     the other accomplished the dispossession by using force, threat, or fraud against the actor.

TEX. PENAL CODE ANN. § 9.41 (West 2011).

(2)     when and to the degree he reasonably believes[4] the deadly force is immediately necessary:

(A)     to prevent the other's imminent commission of . . . burglary . . . .

(B)     to prevent the other who is fleeing immediately after committing burglary . . . ; and

(3)     he reasonably believes that:

(A)     the land or property cannot be protected or recovered by any other means; or

(B)     the use of force other than deadly force to protect or recover the land or property would expose the actor or another to a substantial risk of death or serious bodily injury.

TEX. PENAL CODE ANN. § 9.42 (West 2011).

In this case, Walker contends that, because she locked Updyke out of their home, she had a "greater right to possession of the property" and, as such, when Updyke entered through the window with the intent to assault Walker, he committed the offense of burglary. Continuing with her line of reasoning, Walker claims she was entitled to an instruction on the defense of property. Moreover, Walker maintains that the trial court was required to include in its jury charge an instruction stating that, because Updyke was committing burglary, it was presumed reasonable for Walker to use deadly force against Updyke.[5]

---

[4]A "[r]easonable belief" is "a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." TEX. PENAL CODE ANN. § 1.07(a)(42) (West Supp. 2017).

[5]Sections 9.31(a) and 9.32(b) of the Texas Penal Code provide that an actor's belief that force, or deadly force, was immediately necessary is presumed to be reasonable if, among other things, the actor "knew or had reason to believe that the person against whom the force was used . . . unlawfully and with force entered, or was attempting to enter unlawfully and with force, the actor's occupied habitation, vehicle, or place of business or employment." TEX. PENAL CODE ANN. § 9.31(a) (West 2011). Moreover, a statutory presumption favoring the defendant "must be submitted to

10

The offense of burglary is defined, in pertinent part, as follows: "[I]f, without the effective consent of the owner, the person . . . enters a habitation . . . with intent to commit a felony . . . ." TEX. PENAL CODE ANN. § 30.02(a)(1). An "[o]wner" can be someone who has "a greater right to possession of the property than the actor." TEX. PENAL CODE ANN § 1.07(a)(35) (West Supp. 2017). Thus, ownership of property "may be proven in one of three ways: (1) title, (2) possession[, or] (3) a greater right of possession than the defendant. *Morrow v. State*, 486 S.W.3d 139, 164 (Tex. App.—Texarkana 2016, pet. ref'd) (quoting *Alexander v. State*, 753 S.W.2d 390, 392 (Tex. Crim. App. 1988)). "'Possession' means actual care, custody, control, or management." TEX. PENAL CODE ANN § 1.07(a)(39) (West Supp. 2017). The expansive definition of an owner under the Texas Penal Code "give[s] ownership status to anyone with a rational connection to the property." *Morrow*, 486 S.W.3d at 164 (quoting *Ramirez v. State*, 429 S.W.3d 686, 688 (Tex. App.—San Antonio 2014, pet. ref'd) (quoting *Garza v. State*, 344 S.W.3d 409, 413 (Tex. Crim. App. 2011).

Walker concedes that, on the evening of the incident, the couple had been living together in the mobile home as husband and wife; however, she contends that "their co-tenancy of the residence does not render Updyke's entry into the home lawful." In support of her position, Walker cites *Morgan v. State*, 501 S.W.3d 84 (Tex. Crim. App. 2016). In that case, Morgan was charged with burglary of a habitation after breaking into an apartment that he shared with his girlfriend, Regina. *Id.* at 87. Following a jury trial, he was convicted of burglary of a habitation and sentenced

the jury" "if there is sufficient evidence of the facts that give rise to the presumption," "unless the court is satisfied that the evidence as a whole clearly precludes a finding beyond a reasonable doubt of the presumed fact." TEX. PENAL CODE ANN. § 2.05(b)(1) (West 2011); *Morales v. State*, 357 S.W.3d 1, 7 (Tex. Crim. App. 2011).

to sixteen years in prison. *Id.* The Fort Worth Court of Appeals reversed the judgment of the trial court because Morgan was a "co-tenant" of the apartment and, thus, could not commit the charged offense. *Morgan v. State*, 465 S.W.3d 327, 330 (Tex. App.—Fort Worth 2015, pet. granted). The Court of Criminal Appeals reversed the appellate court's ruling finding that "[Morgan]'s girlfriend, as the complainant, was the 'owner' of the apartment because she held a greater right of possession than [Morgan]. And, at the time of the commission of the offense, [Morgan] did not have her effective consent to enter." *Morgan*, 631 S.W.2d at 87. In making its determination, the Court of Criminal Appeals stated,

> The Penal Code definition of "owner" clearly indicates that a defendant who has some, but less, right to control a habitation than the alleged owner may be prosecuted for burglary. The key is not whether [Morgan] had a right to possession of the property, but whether Regina's right to possess the property was greater than [Morgan]'s. Only her name was on the lease, and she paid the rent. Regina is the one who gave [Morgan] a key to the apartment, and she is the one who could take it away. His status as her roommate at the time did not give him equal "ownership" rights to the apartment. We hold that, at the time of the offense, Regina's right to possess the apartment was greater than [Morgan]'s. At that time, she was the "owner."

*Id.* at 912 (citations omitted).

In *Dominguez v. State*, 355 S.W.3d 918 (Tex. App.—Fort Worth 2011, pet. ref'd), Dominguez was convicted of the capital murder of his girlfriend, Alma.[6] Dominguez was described as being a "jealous" and controlling man, while Alma liked to "t[ake] care of her appearance." *Id.* at 919. Alma, her children, and Dominguez had shared a home until at least one week before the murder. *Id.* Title to the home was held by Alma's sister, but it had been acquired

---

[6]Dominguez was alleged to have murdered his girlfriend while committing burglary of a habitation, which elevated the charge to capital murder. *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (West Supp. 2017).

12

for the benefit of Alma and her children. *Id.* After Dominguez moved out, the locks to the home were changed. *Id.* On the day of the incident, Dominguez broke into the house through the attic and killed Alma. *Id.* at 920. On appeal, Dominguez challenged whether he could commit burglary of a home that Alma did not technically own and for which he had made many of the mortgage payments. *Id.* at 922. In finding that Alma had the greater right to possession of the home, the Fort Worth Court of Appeals emphasized that the home had been purchased for Alma and the children, that Alma had possession of the house, that Dominguez had moved out of the house more than a week before the murder, that Alma had changed the locks, that Dominguez did not have a key to the new locks, and that, in order to enter the home, Dominguez "dropp[ed] down into the boys' room through the attic access." *Id.* at 923.

In this case, Updyke and Walker purchased the mobile home together prior to their marriage and had been living there as husband and wife for approximately three years. There was no evidence that Updyke had any intentions of moving out of the home or that, prior to the incident, Walker had asked Updyke to move out of the home. Moreover, when the couple had separated in the past, it was always Walker who left the home, not Updyke.[7]

In addition, there was no evidence that Walker had obtained a protective order or restraining order against Updyke that would have prohibited him from entering or coming near the home. There existed no evidence that Walker had changed the locks on the home in an effort to prevent Updyke's entrance or that Walker had demanded, and was given, the keys to the home.

_____

[7]Regarding the number of times Walker left the couple's home, Walker's mother, Kim Spencer, testified, "At least probably half a dozen times. I'm sure there were more that I didn't know about because she tried to hide that kind of stuff." Spencer explained that Walker "kept going back to [Updyke]."

13

Notably, during Walker's interview with investigators, she specifically stated that the home belonged to both of them. Walker has cited no cases, nor are we able to find any, that would support her assertion that, merely because Walker temporarily locked Updyke out of their home the evening of the incident, Updyke's right to possession of their home was weakened or that Walker's right to possession of their home was somehow strengthened.[8]

In sum, there is no evidence showing that Walker's right of possession of the home was greater than Updyke's right of possession; thus, Updyke did not unlawfully enter the home. As a result, Walker was neither entitled to an instruction on the defense of property based on the

---

[8]Walker also cites *Stanley v. State*, 631 S.W.2d 751 (Tex. Crim. App. [Panel Op.] 1982), which held that there was no implied consent to break into and enter a habitation merely because of marital status. In that case, Stanley was convicted of burglary of his estranged wife's house. Stanley argued that the marital relationship gave him the right to enter the residence. *Id*. at 753. Finding Stanley's position to be meritless, the court held that Stanley's wife "clearly had the greater right of possession and was an 'owner.'" *Id*. The court explained, "The couple had separated and she had filed for divorce, had moved from the home where she resided with appellant, and had established another home for herself and her son. She had the right to refuse consent. There was no implied consent to break [into] and enter merely because of the marital status." *Id*. Because the facts in *Stanley* differ from those of this case, we do not find *Stanley* to be instructive.

Walker also directs us to *Releford v. State*, No. 10-05-00419-CR, 2007 WL 613717 (Tex. App.—Waco Feb. 28, 2007, pet. ref'd) (mem. op., not designated for publication). To begin with, Rule 47.7(a) of the Rules of Appellate Procedure states that unpublished opinions of the Court of Appeals "have no precedential value but may be cited with the notation, '(not designated for publication).'" TEX. R. APP. P. 47.7(a). Yet, even if we considered *Releford* as persuasive authority, *see Marsh v. State*, 343 S.W.3d 475, 479 n.8 (Tex. App.—Texarkana 2011, pet. ref'd) ("Although these unpublished cases have no precedential value, we may take guidance from them 'as an aid in developing reasoning that may be employed.'") (citing *Carillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd), *Releford* is distinguishable from the present case.

Releford was charged with burglary of a habitation after he entered into the house in which his estranged wife had been living. *Id*. at *1. The couple had been separated for about two months. *Id*. On the morning of the incident, Releford called and said he would be stopping by the home to deliver a Christmas gift. *Id*. at *2. About five minutes after the phone call, Releford came through the back door without knocking. *Id*. at *3. Releford stayed for a few minutes without incident. He then stated he was going to the car to get the gift, but he returned instead with a shot gun and then shot his estranged wife. *Id*. at *2. The jury convicted Releford of the charged offense and sentenced him to ninety-nine years in prison. *Id*. at *1. On appeal, Releford maintained that, by allowing him into the house, his estranged wife and her family had approved of his presence, thereby, negating the element of entering without consent. *Id*. at *2. The Waco Court of Appeals disagreed with Releford, and it determined that there was sufficient evidence to establish that any consent "to come in the house was ineffective because it was procured by Releford's fraudulent statement that he was there to deliver a Christmas gift." *Id*. at *4. None of the facts contained in *Releford* are present in the case before us, and thus, *Releford* has very little, if any, relevance to our discussion.

14

underlying offense of burglary nor entitled to an instruction on the presumption that her actions were reasonable. We overrule Walker's first point of error.

### 2. Punishment Phase Jury Instructions

Next, Walker contends that the trial court erred when it failed to include an instruction on sudden passion during the punishment phase of the proceedings. "Sudden passion" is "passion directly caused by and arising out of provocation by the individual killed" which arises at the time of murder. TEX. PENAL CODE ANN. § 19.02(a)(2) (West 2011). "At the punishment stage of the trial, the defendant may raise the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause." TEX. PENAL CODE ANN. § 19.02(d) (West 2011). "If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree." *Id.* "'Adequate cause' means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." TEX. PENAL CODE ANN. § 19.02(a)(1) (West 2011).

To be entitled to a jury instruction on the issue of sudden passion during the punishment phase, the record must at least minimally support the following inferences: (1) that the defendant acted under the immediate influence of a passion such as terror, anger, rage, or resentment; (2) that his sudden passion was induced by some provocation by the deceased or another acting with him, which provocation would commonly produce such a passion in an individual of ordinary temper; (3) that he committed the murder prior to regaining his capacity for cool reflection; and (4) that a causal connection existed "between the provocation, the passion, and the homicide." *McKinney*

15

*v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005). Passion that is "solely the result of former provocation" does not suffice. *Hobson v. State*, 644 S.W.2d 473, 478 (Tex. Crim. App. 1983) (quoting TEX. PENAL CODE ANN. § 19.04(b)). If a defendant presents evidence of sudden passion, he or she is entitled to an instruction on this mitigating circumstance even if the evidence raising such an issue is contradicted, weak, or unbelievable. *Trevino v. State*, 100 S.W.3d 232, 238 (Tex. Crim. App. 2003) (per curiam). The question is whether there was any evidence from which a rational jury could infer such passion. *Moore v. State*, 969 S.W.2d 4, 11 (Tex. Crim. App. 1998).[9]

Evidence of fear alone, or self-defense, is not sufficient to raise sudden passion. The record must show some evidence of all of the elements of Section 19.02(d). TEX. PENAL CODE ANN. § 19.02(d). An actor who fears for his or her life may calmly and deliberately assault his or her assailant without panic or hysteria. *Fry v. State*, 915 S.W.2d 554, 559 (Tex. App.—Houston [14th Dist.] 1995, no pet.). Further, not all testimony regarding anger or fear rises to the level of sudden passion. *Gonzales v. State*, 717 S.W.2d 355, 357 (Tex. Crim. App. 1986). In order "[f]or a claim of fear [or anger] to rise to the level of sudden passion, the defendant's mind must be rendered incapable of cool reflection." *Id.* (holding that sudden passion instruction not necessary where there was testimony indicating defendant was emotionally aroused at the time of shooting). Testimony that the defendant became enraged, resentful, or terrified immediately before the shooting adequately indicates such a state of mind. *Havard v. State*, 800 S.W.2d 195, 217 (Tex. Crim. App. 1989) (op. on reh'g) (holding appellant's testimony that he was "emotionally hurt and

---

[9]Moreover, there is no requirement that evidence admitted at the guilt/innocence phase of the trial be reoffered to be considered at punishment. *Trevino*, 100 S.W.3d at 238.

mad at the time he raised his rifle" and feared for his life when he "saw two men with weapons drawn coming toward him" was sufficient to require a sudden-passion instruction).

In *Fry*, 915 S.W.2d at 558, Fry testified that the victim and his friend forced their way into his home and that the victim was carrying a wooden stake in his pocket. Fry stated that he was afraid of the victim because the deceased had a reputation of being a "trained killer," so Fry proceeded to get a rifle. *Id.* A brief struggle ensued over the rifle, after which the victim and his friend left the home. *Id.* Fry then stepped onto the front porch with the rifle. He testified that the victim told his friend to "[g]o get the gun" and that the victim put his hand in his pants pocket and threatened Fry's life. *Id.* Fry then shot the victim. *Id.* According to Fry, he feared for his life and he was "in quite a . . . state of shock." *Id.* He stated further that he had no intention of hurting anyone and that both shots were intended only to "scare" the victim. *Id.* The Houston Court of Appeals found that Fry's testimony showed a reflective and deliberate response to a perceived threat, not a spontaneous response to anger, rage, resentment, or terror. *Id.*

In this case, Walker testified that she was angry with Updyke and scared of what he might do to her when he entered their home. There was no evidence, however, that Walker's anger or fear rendered her incapable of cool reflection to the level of sudden passion. Instead, the evidence shows that Walker's actions were deliberate and reflective. Walker not only sent Updyke a text message that she would shoot him if he came inside the home, she also sent other individuals text messages that evening evidencing her intent to kill Updyke.

Moreover, the evidence also showed that Walker anticipated the event at issue and prepared herself to respond to Updyke's actions by running to her room and removing a previously loaded

17

gun from a "gun box" she kept in her closet. Further, when Walker was asked by investigators why she did not choose to run out of the front door of the home instead of shooting Updyke, she explained that Updyke would have locked her out of the house without her keys if she had done that. Walker's response demonstrates that she considered her options that evening and was capable of making a choice, albeit a bad one.[10]

Accordingly, we find that the trial court did not err when it failed to include a jury instruction on the issue of sudden passion. We overrule Walker's second point of error.

## III. Attorney's Fee Error

Lastly, Walker contends that the trial court erred in assessing attorney's fees against her. Under Article 26.05(g) of the Texas Code of Criminal Procedure, a trial court has the authority to order the reimbursement of court-appointed attorney's fees only if "the judge determines that a defendant has financial resources that enable the defendant to offset in part or in whole the costs of the legal services provided . . . , including any expenses and costs." TEX. CODE CRIM. PROC. ANN. art. 26.05(g) (West Supp. 2017). "[T]he defendant's financial resources and ability to pay are explicit critical elements in the trial court's determination of the propriety of ordering reimbursement of costs and fees" of legal services provided. *Armstrong v. State*, 340 S.W.3d 759, 765–66 (Tex. Crim. App. 2011) (quoting *Mayer v. State*, 309 S.W.3d 552, 556 (Tex. Crim. App. 2010)).

---

[10]We note that there is evidence in the record that Updyke pushed Walker earlier in the evening and that he was alleged to have physically assaulted her months prior to the incident; however, there is no evidence that Updyke's behavior during the evening or the alleged physical assaults against Walker months earlier "produce[d] a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." TEX. PENAL CODE ANN. § 19.02(a)(1).

Because Walker was found to be indigent and she is presumed to remain indigent absent proof of a material change in her circumstances, the trial court's judgment incorrectly assessed attorney's fees in the amount of $13,980.00.[11] *See* TEX. CODE CRIM. PROC. ANN. arts. 26.04(p), 26.05(g) (West Supp. 2017); *Mayer v. State*, 309 S.W.3d 552, 557 (Tex. Crim. App. 2010); *Watkins v. State*, 333 S.W.3d 771, 781–82 (Tex. App.—Waco 2010, pet. ref'd). The State concedes this point and asks this Court to modify the trial court's judgment.

Appellate courts "have the authority to reform judgments and affirm as modified in cases where there is non reversible error." *Ferguson v. State*, 435 S.W.3d 291, 294 (Tex. App.—Waco 2014, no pet.) (comprehensively discussing appellate cases that have modified judgments). Accordingly, we modify the trial court's judgment by deleting the assessment of attorney's fees.

## IV. Conclusion

We modify the trial court's judgment by deleting the assessment of $13,980.00 in attorney's fees. As modified, the trial court's judgment is affirmed.


Ralph K. Burgess
Justice

Date Submitted:     November 30, 2017
Date Decided:       February 21, 2018

Publish

---

[11]The trial court also appointed Walker counsel on appeal.

19