

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-23-00172-CR
_____

BRANDON EVERETT PALMER, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 202nd District Court
Bowie County, Texas
Trial Court No. 22F0338-202

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice van Cleef

A jury found Brandon Everett Palmer guilty of continuous trafficking of persons, a first-degree felony. *See* TEX. PENAL CODE ANN. § 20A.03. The trial court sentenced Palmer to life in prison. In this appeal,[1] Palmer argues that (1) the application portion of the guilt/innocence jury charge did not require two acts to have occurred over at least a thirty-day period, which, according to Palmer, resulted in egregious harm; (2) the testimony of unspecified threats against a trial witness was irrelevant and highly prejudicial; and (3) this Court should modify the judgment to remove the enhancement paragraph. As modified, we affirm the trial court's judgment of conviction.

## I.      Background

In August 2023, the State filed an amended indictment against Palmer, alleging the following:

> [Palmer] did then and there, during a period that was 30 or more days in duration, to-wit:  beginning on or about July 5, 2015, and continuing until on or about June 17, 2021, commit two or more acts of trafficking persons namely:
>
> •      Knowingly traffic Adult Victim #9 (a pseudonym) and through force, fraud, or coercion cause Adult Victim #9 (a pseudonym) to engage in conduct prohibited by the Texas Penal Code Section 43.02-Prostitution
>
> •      Knowingly traffic Adult Victim #13 (a pseudonym) and through force, fraud, or coercion cause Adult Victim #13 (a pseudonym) to engage in conduct prohibited by the Texas Penal Code Section 43.02-Prostitution

---

[1]Palmer appeals his conviction of aggravated sexual assault in our cause number 06-23-00173-CR and possession of a prohibited item in a correctional facility in our cause number 06-23-00174-CR.

**HABITUAL OFFENDER**

And it is further presented to said Court that prior to the commission of the offense alleged above, the said <u>Brandon Palmer</u>, hereinafter referred to as the defendant, was finally convicted on <u>October 3. 2012</u>, in cause number of <u>12F0604-102</u> in the <u>102nd District Court of Bowie County, Texas</u>, the defendant was convicted of the felony offense of <u>Unlawful Possession of a Firearm by Felon</u>.

At trial, Dr. Vanessa Bouché, a scholar and expert in human trafficking and formerly a professor of political science, testified about the different ways traffickers persuade their victims to participate in a trafficking organization, including by drug-based coercion. Bouché explained,

> But when drugs are used, which is very common, it is used in a variety of different ways. So one way is that traffickers will look for women who already have a substance abuse issue, because that's a major vulnerability, and that's a vulnerability that can be exploited by the trafficker. And so they will specifically target people with substance addictions, because they're easier to control. So that's one way.
>
> . . . . And so that then is a coercive tactic to get them to do what they want them to do. They will give them drugs as a reward system for doing what they want them to do, and then they will also - - there have been times where they will provide them with the drugs and then - - for free, and then force them to work off that debt for the drugs. So the woman is never actually seeing, you know, any - - she's literally having sex for the drugs, and the trafficker is providing her with those drugs for that purpose.

In addition, according to Bouché, a trafficking victim who is addicted to drugs will almost always do what the trafficker tells her to do because, if she refuses, "the victim then is terrified of going through withdrawal and going without their drugs." Bouché stated that withdrawal symptoms are much worse than the general public believes them to be. Withdrawal symptoms "can be very, very significant from extreme, extreme shakes, vomiting, sweating, just all kinds of really awful conditions that take place when you're trying to detox from a drug."

Withdrawal can even result in death. According to Bouché, "[T]he threat of withdrawal sickness constitutes a psychological harm that is sufficiently serious under the surrounding circumstances to compel a reasonable person in that same background and circumstances to perform or to continue performing commercial sexual activity."

Bouché also testified that trafficking victims usually have had adverse childhood experiences, including, "growing up in poverty, not having enough food to eat, not having safe shelter, as well as issues around substance abuse . . . as a minor and/or [their] parents['] or guardians' substance abuse." Those individuals have issues because they have been "physical[ly] abuse[d], sexual[ly] abuse[d], and verbal[ly] and psychological[ly] abuse[d] as children and all of those things that have kind of collectively made [their] childhood a very traumatic one."

Lastly, Bouché explained that "almost never do victims of trafficking actually self-identify as a victim of anything, actually, as a victim of trafficking, let alone anything else." That way of thinking is oftentimes due to the adverse trauma the victims received as children and because they have a "poor sense of self," leading them to believe that anything negative in their lives is their own fault. Bouché added, "[T]he trafficker does a very good job of also getting them to believe that they are making this choice on their own. The trafficker wants them to believe that they're autonomous. Otherwise, he can't do as good of a job controlling them."

Shytavia Stanley, Adult Victim #9, testified that, at fourteen years of age, she ran away from home and moved in with her boyfriend, who was seventeen years old at the time. Stanley

4

lived with him "off and on" for about five years.[2]  During those years, Stanley's boyfriend became physically, verbally, and emotionally abusive towards her.  After the pair lived together for around three years, at age seventeen, Stanley began using drugs.

In 2019, Stanley "completely left [her boyfriend] alone" and "went to live with [her] godmother in Texarkana."  In 2021, Stanley began living in motels on State Line Avenue, mainly residing at the Roadway, Travel Lodge, or the Magnuson.  During that time, Stanley smoked methamphetamine, which eventually led to "shooting it" every day.[3]

Stanley met Palmer through her aunt, who also stayed at the Magnuson.  According to Stanley, "[H]e had came to her [aunt's] room at the Magnuson, and he was trying to get her to go with him to jump a lick."  Stanley explained that "jump a lick" meant "[p]rostituting, having sex with people for money."  Because Stanley needed money,[4] she told Palmer that she would do it, and "that's when [they] went to [Rashaan Cunningham]'s[5] house in Arkansas."  At first, Stanley was uncomfortable, but Palmer persuaded her to go with him to Rashaan's house by telling her that he would give her "drugs so [she could] get high."  She explained that Palmer "recruit[ed] her] to go and have sex with Rashaan," and "then [Rashaan] gave [Palmer] the money, and [Palmer] gave [Stanley] drugs."  While the pair was having sex, Palmer waited outside in a truck. After the transaction was completed, Palmer returned Stanley to the motel.  It was around that

---

[2]Stanley said her life was unstable during that period, explaining, "I was back and forth from his mama house to my mama house.  Whenever I get into it with my mama, I'll leave and go back to his mama house."

[3]Stanley had two children with her boyfriend, and the children lived with her mother.  Regarding her mother, she stated, "She had took them from me."

[4]Later, Stanley testified that she agreed to go with Palmer because she needed drugs.

[5]Rashaan is also known as "Fashion."

5

time that Stanley began to understand that the men were working as an organization to recruit women to have sex for money.

After that day, on "[l]ike 20" occasions, Palmer contacted Stanley for the purpose of recruiting her to have sexual relations with other individuals. According to Stanley, the first incident with Rashaan occurred in April 2021, and the last incident occurred in June 2021 when she went to jail on an unrelated offense.

Stanley said that she always received drugs from Palmer after having sex with men and that she never received money. Palmer always kept the money, which sometimes was between $200.00 and $250.00. Stanley explained, "[T]hen we'll go to the room, and then the guy will come in, and we'll do it. And he would say that he already paid. So when I c[a]me out, then [Palmer would] give me the drugs."

Stanley said that she usually spent about an hour with an individual. She also explained the usual process between Palmer and Rashaan, that is, an individual would contact Rashaan, Rashaan would get in touch with Palmer, and then Palmer would contact her. Stanley said that Palmer coerced her to have sex with men because he would give her methamphetamine in return. According to Stanley, it was her daily addiction to methamphetamine that caused her to continue working with Palmer.

Adult victim #13, Savanaha Works, testified that she was sexually abused in the past and that she lived with her great-grandmother because her mother was on drugs and had been to prison. Works began using drugs when she was around ten or eleven years old. When Works was around sixteen or seventeen and living in a motel, Works became acquainted with Palmer

through Palmer's uncle. Works testified that she had seen "Palmer put drugs in girls' drinks and have sex with them without their consent." Furthermore, Works had seen Palmer offer a girl one type of drug, but then unbeknownst to the girl, he would give her a different drug. She stated, "Well, they would - - he would say it was meth, and then it would end up being like something to put them to sleep or to make them like kind of out of it, you know." It was during that time that Palmer began "selling [Works] for sex." He would pick Works up from a particular location and then drive her to another location where she would have sex for money with other individuals.

Works also testified that, during that time, she had a serious methamphetamine addiction and that she smoked it, as opposed to shooting it in her arm. Works explained that she would wake up in the morning needing methamphetamine and that she would "look for money to come up with more to get high again, and it just kind of [went] in a circle." She stated, "I mean, just anything goes. It doesn't matter really." According to Works, in addition to Palmer selling her for sex, his brother, Marcus Palmer, did so as well. However, Works never dealt directly with Rashaan.

Works testified that, between 2015 and 2019, Palmer sold Works for sex "[f]orty, fifty, sixty [times], a lot." According to Works, Palmer sold her for sex at least one time per year from 2015 through 2019. Works witnessed Palmer control women using force, fraud, and coercion. She also believed he was involved in the distribution of Fentanyl. According to Works, Palmer thought women were "stupid," men act like they are "superior," and Palmer was proud to be a "pimp." Works was also aware that Palmer was trafficking other women for sex.

7

## II.     Jury-Charge Error

In his first point of error, Palmer contends that the application portion of the guilt/innocence charge did not require the acts of trafficking to be over at least a thirty-day period, which resulted in egregious harm[6] and fundamental error.

"We employ a two-step process in our review of alleged jury-charge error." *Murrieta v. State*, 578 S.W.3d 552, 554 (Tex. App.—Texarkana 2019, no pet.) (citing *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994)). "Initially, we determine whether error occurred and then evaluate whether sufficient harm resulted from the error to require reversal." *Id.* (quoting *Wilson v. State*, 391 S.W.3d 131, 138 (Tex. App.—Texarkana 2012, no pet.) (citing *Abdnor*, 871 S.W.2d at 731–32)).

The level of harm that must be shown as having resulted from an erroneous jury instruction depends on whether the appellant properly objected to the error at trial.[7] *Abdnor v. State*, 871 S.W.2d 726, 732 (Tex. Crim. App. 1994). When a proper objection is made at trial, reversal is required if there is "some harm" "calculated to injure the rights of the defendant." *Id.* (quoting *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g)). But, as in this case, "[w]hen the defendant fails to object . . . to the charge, we will not reverse for jury-charge error unless the record shows 'egregious harm' to the defendant." *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005) (citing *Bluitt v. State*, 137 S.W.3d 51, 53 (Tex. Crim. App. 2004); *Almanza*, 686 S.W.2d at 171). In evaluating for egregious harm, we must

---

[6]Palmer did not object to the instruction at trial.

[7]"[T]o preserve error relating to the jury charge[,] there must either be an objection or a requested charge." *Vasquez v. State*, 919 S.W.2d 433, 435 (Tex. Crim. App. 1996).

decide whether the error created such harm that the appellant did not have a "fair and impartial trial." TEX. CODE CRIM. PROC. ANN. art. 36.19; *see Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008); *Almanza*, 686 S.W.2d at 171. "Neither the State nor the defendant has a burden to prove harm." *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013).

As always, "the jury is the exclusive judge of the facts, but it is bound to receive the law from the court and be governed thereby." TEX. CODE CRIM. PROC. ANN. art. 36.13. A trial court must submit a charge "setting forth the law applicable to the case." TEX. CODE CRIM. PROC. ANN. art. 36.14. "The purpose of the jury charge . . . is to inform the jury of the applicable law and guide them in its application . . . ." *Lee v. State*, 415 S.W.3d 915, 917 (Tex. App.—Texarkana 2013, pet. ref'd) (quoting *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007)). "It is not the function of the charge merely to avoid misleading or confusing the jury[;] it is the function of the charge to lead and prevent confusion." *Id.* (quoting *Delgado v. State*, 235 S.W.3d at 249).

In this case, the application paragraph in the jury instructions provided,[8]

> Now, if you find from the evidence beyond a reasonable doubt that the Defendant, BRANDON PALMER, did then and there in Bowie County, Texas, during a period that was thirty or more days in duration, to wit: beginning on or

---

[8]The abstract portion of the charge read as follows:

> Our law provides a person commits the offense of Trafficking of Persons if the person knowingly traffics another person and, through force, fraud, or coercion, causes the trafficked person to engage in conduct prohibited by Section 43.02 (Prostitution).

> Our law provides a person commits the offense of Continuous Trafficking of Persons if, during a period that is 30 or more days in duration, the person engages two or more times in conduct that constitutes an offense under Section 20A.02- Trafficking of Person against one or more victims.

9

about July 5, 2015[,] and continuing until on or about June 17, 2021, commit two or more acts of trafficking of persons, namely:

- Knowingly traffic Adult Victim #9 (a pseudonym) through force, fraud, or coercion cause Adult Victim #9 (a pseudonym) to engage in conduct prohibited by Texas Penal Code section 43.02- Prostitution

- Knowingly traffic Adult Victim #13 (a pseudonym) through force, fraud, or coercion cause Adult Victim #13 (a pseudonym) to engage in conduct prohibited by Texas Penal Code section 43.02- Prostitution

then you will find defendant guilty of Continuous Trafficking of Persons as charged in the Indictment in Cause Number 22F0338-202.

Unless you find beyond a reasonable doubt that the defendant is guilty of Continuous Trafficking of Persons, under these instructions, or if you have a reasonable doubt thereof, you will acquit him of that offense . . . .

Palmer points out that "the application paragraph required the jury to find that [he] committed two or more acts of trafficking." Additionally, the paragraph "required those acts to take place 'during a period that was thirty or more days in duration, to wit: beginning on or about July 5, 2015[,] and continuing until on or about June 17, 2021.'" Palmer contends that the complained-of instruction did "not expressly require the two or more acts to take place over <u>at least</u> a 30-day period as specifically required by the Penal Code provision." Quoting *Turner v. State*, Palmer argues that "[s]uch language 'suggests to the jury that the thirty-day requirement was met if it found [he] committed two or more acts during a period of thirty days or more' rather than the statute's requirement that two acts 'must occur thirty or more days apart.'" *Turner v. State*, 573 S.W.3d 455, 462 (Tex. App.—Amarillo 2019, no pet.).

In *Smith v. State*, the Houston First Court of Appeals found that the trial court's jury charge was erroneous because it allowed the jury to find Smith guilty if two or more acts of sexual abuse occurred during a specific period that was longer than thirty days, regardless of whether the acts occurred at least thirty days apart. *Smith v. State*, 340 S.W.3d 41, 50 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

The application paragraph in *Smith* stated,

Now, if you find from the evidence beyond a reasonable doubt that *on or about the 1st day of December, 2007, through the 1st day of September, 2008, which said time period being a period that was 30 days or more in duration*, in Brazoria County, Texas, the defendant Jesse James Smith, committed two or more acts of sexual abuse against [the victim], said acts of sexual abuse having been violations of one or more of the following:  [two acts of aggravated sexual assault are particularly described], then you will find the defendant guilty of the offense of Continuous  Sexual Assault of a Child, as alleged in Count One of the Indictment.

*Id.* (second alteration in original).  Finding error in the jury charge, the appellate court explained,

The precise phrasing in the application paragraph does not specifically require a finding that the last act of sexual abuse occurred [30 or more days] after the day of the first act.  Rather it allows a finding of guilt if two or more acts of sexual abuse occurred "on or about the 1st day of December, 2007, through the 1st day of September, 2008, which said time period being a period that was 30 days or more in duration."  This instruction lacks clarity in that, read literally, it allowed the jury to find appellant guilty so long as two or more acts of sexual abuse occurred between December 2007 and September 2008 regardless of whether the acts occurred at least 30 days apart.

*Id.*

The same or similar reasoning applies in this case.   Here, the application paragraph contained "error because it confuse[d] the statutorily required thirty-day period for continuous sexual abuse with the 'on or about' periods alleged with respect to [the] commission of the

11

predicate offenses." *Turner*, 573 S.W.3d at 462.  In other words, the jury could have easily read the instruction as directing it to find Palmer guilty if (1) there were thirty or more days between the dates in the indictment, that is, "to wit:  beginning on or about July 5, 2015 and continuing until on or about June 17, 2021," and (2) during that time, Palmer trafficked the victims on two or more occasions.[9]

In *Turner*, the Amarillo Court of Appeals addressed a similar charge issue in a continuous sexual abuse of a child case.  In that case, the jury instructions stated, in relevant part,

> Now bearing in mind the foregoing instructions, if you unanimously believe from the evidence beyond a reasonable doubt, that defendant, DAVID BLAKE TURNER, on or about June 1, 2013 through August 1, 2013, . . . *during a period that was 30 days or more in duration*[,] . . . intentionally or knowingly commit[ted] two or more acts of sexual abuse against [victim], . . .

then the jury should find Turner guilty.  *Id.* (third alteration in original) (emphasis added).  The State argued that the application paragraph was not erroneous because it tracked the statutory requirements of the offense of continuous sexual abuse of a child.  *Id.*  The *Turner* court was not convinced.  Finding error in the charge, the court stated,

> Unfortunately, the State's argument relies too heavily upon the assumption that the statute itself is an example of clarity.  Broken down into its component parts, the application paragraph used in this case does nothing more than the application paragraph in *Jimenez* [*v. State*, No. 07-13-00303-CR, 2015 WL 6522867 (Tex. App.—Amarillo Oct. 26, 2015, pet. ref'd) (mem. op., not designated for publication)], by requiring that (1) *during* a period of thirty days or more (2) the defendant intentionally or knowingly committed two or more acts of sexual abuse. While someone with an understanding of the statute might argue that this provision is clear, the express language used does not make it clear that the first and last acts must occur thirty or more days apart.  Like *Jimenez*, because the application paragraph here suggests to the jury that the thirty-day requirement was

[9]*See Lewis v. State*, No. 06-21-00021-CR, 2022 WL 630288, at *1 (Tex. App.—Texarkana Mar. 4, 2022, pet. ref'd) (mem. op., not designated for publication), *cert. denied*, 143 S.Ct. 740, 214 L.Ed.2d 388 (U.S. 2023).

12

met if it found Appellant committed two or more acts during a period of thirty days or more, it was erroneous.

*Turner*, 573 S.W.3d at 462–63. The same is true in this case. Accordingly, we find the application paragraph contained an erroneous instruction.

Because Palmer failed to object to the trial court's jury charge, "we apply the 'egregious harm' standard wherein reversal is required only if the charge error was 'so egregious and created such harm that the defendant has not had a fair and impartial trial.'" *Gomez v. State*, 459 S.W.3d 651, 660 (Tex. App.—Tyler 2015, pet. ref'd) (quoting *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009), *overruled on other grounds by Sandoval v. State*, 665 S.W.3d 496, 537 (Tex. Crim. App. 2022)). When we determine whether Palmer "was deprived of a fair and impartial trial, we review the entire charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel, and any other relevant information revealed by the record of the trial as a whole." *Id.* at 660–61 (citing *Taylor v. State*, 332 S.W.3d 483, 489 (Tex. Crim. App. 2011)).

Furthermore, "[w]e will examine any part of the record that may illuminate the actual, not just theoretical, harm to the accused." *Id.* at 661 (citing *Taylor*, 332 S.W.3d at 489–90). "Errors which result in egregious harm are those that affect the very basis of the case, deprive the defendant of a valuable right, vitally affect the defensive theory, or make a case for conviction clearly and significantly more persuasive." *Id.* (citing *Taylor*, 332 S.W.3d at 490). Egregious harm is a demanding standard, "and such a determination must be done on a case-by-case basis." *Id.*

13

With the exception of the error at issue, Palmer had no additional complaints about the content of the jury charge, including the abstract portion of the jury charge, which explained, "Our law provides a person commits the offense of Continuous Trafficking of Persons if, during a period that is 30 or more days in duration, the person engages two or more times in conduct that constitutes an offense under Section 20A.02- Trafficking of Person[s] against one or more victims." In fact, Palmer specifically concedes that the abstract portion of the charge was correct.

Regarding the evidence on this issue, Stanley testified that, pursuant to Palmer's directions, she had sexual intercourse with men for money on "[l]ike 20" occasions and that she received methamphetamine to continue her ongoing habit of abusing drugs. She also stated that the first incident occurred in April 2021 and the last incident occurred in June 2021 when she went to jail. There are certainly more than thirty days between those two months (all of May 2021).

Furthermore, Works testified that Palmer sold her for sex at least one time each year from 2015 through 2019. Again, there are clearly thirty days in between the first instance of trafficking in 2015 and the last incident in 2019. Also, much like Stanley's testimony, Works testified that Palmer gave her drugs after she had intercourse with an individual and that she needed those drugs to satisfy her drug addiction. In sum, the two victims in this case provided testimony that was consistent with a finding that there were at least thirty days in between the first act of trafficking and the last act of trafficking.

14

The parties' closing arguments did not address the thirty-day element to any great extent. However, the State reminded the jury in its closing argument that Stanley testified that Palmer "trafficked her over 20 times from the time that he took her the first time to Rashaan's house in April 2021 through June 2021." According to the State's argument, the first offense occurred in April 2021 and the last offense occurred in June 2021. Even assuming that the first offense took place on April 30, 2021, and the last offense occurred on June 1, 2021, there were at least thirty days in between the two offenses. Palmer did not argue against the State's assertion, nor did he object to that portion of the State's argument on the basis that it was not supported by the evidence during trial.

The evidence presented to the jury overwhelmingly showed that (1) Palmer trafficked Stanley on at least two occasions, (2) that those two occasions were at least thirty days apart from one another, (3) that Palmer trafficked Works on at least two occasions, and (4) that those two occasions were at least thirty days apart from one another. Accordingly, the evidence presented at trial does not show that the charge error caused Palmer egregious harm.

We overrule Palmer's first point of error.

## III.    The Trial Court's Evidentiary Ruling

Next, Palmer contends that it was error for the trial court to admit evidence of "unspecified threats against [a] trial witness, Jequenda Green." According to Palmer, the complained-of testimony was irrelevant and highly prejudicial.

"We review a trial court's decision to admit or exclude evidence for an abuse of discretion." *Flowers v. State*, 438 S.W.3d 96, 103 (Tex. App.—Texarkana 2014, pet. ref'd)

15

(citing *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010)). "Abuse of discretion occurs only if the decision is 'so clearly wrong as to lie outside the zone within which reasonable people might disagree.'" *Id.* (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008)). "We may not substitute our own decision for that of the trial court." *Id.* (citing *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003)). "We will uphold an evidentiary ruling if it was correct on any theory of law applicable to the case." *Id.* (citing *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009)).

In support of his argument, Palmer directs us to the testimony of the State's witness, Officer Brisco Davis:

> Q.      Okay.  I want to ask finally before I pass the witness back over to the defense, yesterday, the jury heard from a witness, Ms. Jequenda Green.  Do you recall Ms. Green?
>
> A.      Yes.
>
> Q.      Right.  You've interviewed her a couple of times, have you not?
>
> A.      Uh-huh (yes).
>
> Q.      Okay.  Does Ms. Green have children?
>
> A.      She does.
>
> Q.      Okay.  And Ms. Green testified yesterday.  I know you were outside the courtroom.  Just prior to her coming inside the courtroom, did an individual make contact with Ms. Green out in the hallway and speak to her about her children?
>
> A.      Yes.
>
> Q.      Did that greatly upset Ms. Green prior to her testimony?

16

A. Yes.

Q. Okay. None of us had any knowledge of that yesterday during the day, did we?

A. Not till later.

Q. And Ms. Green made you aware and was very upset about the comment made about her children yesterday; is that correct?

A. She felt threatened by it.

[(BY PALMER'S COUNSEL]): Your Honor, I'm going to object as to relevance as to what transpired --

Palmer argues that the trial court should have sustained his relevance objection. Rule 402 of the Texas Rules of Evidence provides that all relevant evidence is admissible. TEX. R. EVID. 402. Rule 401 of the Texas Rules of Evidence defines relevance as having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. TEX. R. EVID. 401.

Other than a broad-based description of a threat to Green's children, there was no testimony as to who made the alleged threat or the substance of that threat. The State contends that the jury was free to infer that Palmer "caused that to happen."[10] We disagree.

---

[10]The State's argument is less than compelling.

> The context was an undisclosed individual made a threat to a witness right before she was going to testify, and she felt threatened. The jury was free to believe that the defendant caused that to happen. It is also relevant to whether the defendant set in motion the threat (even if he did not make the threat).

The State continued, "It is relevant to the culture that [Palmer] cultivated that would tamper with a witness on his behalf without him knowing or he did cause it to occur."

17

In *Hooper v. State*, the Texas Court of Criminal Appeals explained the difference between an inference and mere speculation.

> [A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them. Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented. A conclusion reached by speculation may not be completely unreasonable, but it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt.

*Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007).

In this case, there was no factual evidence showing that Palmer played any part in making the alleged threat to Green, and the State's assertion that he was somehow involved in making the threat was mere speculation. Without the jury having more information, it does not appear that Davis's testimony made the existence of a fact of consequence more probable or less probable. Thus, the trial court erred when it allowed Davis to testify to the alleged threat against Green.

Palmer must also show that he was harmed by the trial court's admission of the complained-of testimony. In general, the erroneous admission of evidence by a trial court constitutes non-constitutional error and is subject to a harm analysis. *Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010). Non-constitutional error necessitates a reversal only when it affects the substantial rights of the accused. TEX. R. APP. P 44.2(b). An appellate court may not overturn a conviction for non-constitutional error if, after examining the record, it has a fair assurance that the error did not influence the outcome of the trial or had but a slight effect. *Barshaw v. State*, 342 S.W.3d 91, 93–94 (Tex. Crim. App. 2011).

18

When assessing the likelihood that the trial court's erroneous ruling influenced the outcome of the trial, the appellate court should consider the entire record, including testimony, physical evidence, jury instructions, the State's theory of the case and any defensive theories, the parties' closing arguments, and when applicable, jury selection. *See King v. State*, 953 S.W.2d 266, 271–72 (Tex. Crim. App. 1997).

Again, the jury did not hear testimony from Davis, or anyone else for that matter, as to who made the alleged threat. The same is true regarding the substance of the threat. At most, the jurors were left to wonder whether Palmer was the instigator of the unknown threat. To some extent, this is a challenging issue because the error occurred during the guilt/innocence phase of the trial, and one of the elements of the charged offense was Palmer's coercion of the victims. The State nearly concedes that point when it erroneously argues, regarding the relevance of the evidence, that the jury could have "inferred" that the threat to Green was initiated by Palmer. There was absolutely no evidence of that, and we are not tasked with determining the intent of the State. Also, the State introduced the evidence but did not reiterate or belabor it or mention it in closing argument.[11] Usually, this would weigh against an appellant's argument, *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018), but the irrelevant evidence in this case was presented to the jury just prior to the close of the State's case.

On the other hand, the evidence of Palmer's guilt was overwhelming. Stanley and Works testified as to how, when, and why they were subject to Palmer's trafficking orders. Stanley testified that she had sexual relations with men pursuant to Palmer's request "[f]orty, fifty, sixty

---

[11]We also note that Palmer's counsel chose not to cross-examine the reporting witness.

19

[times], a lot." Works testified that she had sexual relations with a variety of men pursuant to Palmer's request "[l]ike 20" times between the months of April and June 2021. They both testified that they had less than ideal childhoods that were filled with abuse and a good deal of chaos. When they began their relationships with Palmer, they were addicted to drugs, and he made certain that they remained that way. On Palmer's orders, the women engaged in sexual relations with a significant number of men and, afterwords, Palmer would provide them with illegal substances that they needed to avoid having serious withdrawal symptoms. In exchange for the women having sexual relations with the men, Palmer received remuneration from the men. Bouché's testimony about trafficking victims and their abusers was very similar, if not almost identical, to Stanley's and Work's descriptions of their lives and their involvement with Palmer.

After examining the entire record, this Court has a fair assurance that the admission of Davis's testimony regarding an alleged threat against Green did not influence the outcome of the trial or had but a slight effect. *See Barshaw*, 342 S.W.3d at 93–94.

We overrule Palmer's second point of error.

## IV.   Modification of the Judgment

In his third point of error, Palmer maintains that, because the jury did not make an enhancement finding on the continuous trafficking charge, the Court should modify the judgment to remove the enhancement. The State concedes the error.

"Appellate courts 'have the authority to reform judgments and affirm as modified in cases where there is non reversible error.'" *Walker v. State*, 557 S.W.3d 678, 690 (Tex. App.—

20

Texarkana 2018, pet. ref'd) (quoting *Ferguson v. State*, 435 S.W.3d 291, 293 (Tex. App.—Waco 2014, pet. struck), *overruled on other grounds by Cummins v. State*, 646 S.W.3d 605 (Tex. App.—Waco 2022, pet. ref'd); *see Anthony v. State*, 531 S.W.3d 739, 743 (Tex. App.—Texarkana 2016, no pet.) ("This Court has the power to correct and modify the judgment of the trial court for accuracy when the necessary data and information are part of the record." (citing TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27 (Tex. Crim. App. 1993); *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd))).

Here, because the jury did not make an enhancement finding on the continuous trafficking charge, we sustain Palmer's third point of error and modify the second amended judgment of conviction by deleting "YES" to the first enhancement paragraph and by deleting "TRUE" to the finding on the first enhancement paragraph.

We sustain Palmer's third point of error.

## V.      Conclusion

We modify the trial court's second amended judgment of conviction by deleting "YES" to the first enhancement paragraph and by deleting "TRUE" to the finding on the first enhancement paragraph. We affirm the trial court's judgment, as modified.

Charles van Cleef
Justice

Date Submitted:      July 10, 2024
Date Decided:       August 23, 2024

Do Not Publish